**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David NOVAK, Defendant–Appellant.**

**No. 01–10346.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 17, 2002.

Filed March 4, 2002.

Alexander A. Modaber (Argued & Briefed), Federal Public Defender's Office, Las Vegas, Nevada, for the defendant-appellant.

Robert A. Bork (Argued), United States Attorney's Office, Las Vegas, Nevada, for the plaintiff-appellee.

Karyn Kenny (Briefed), United States Attorney's Office, Las Vegas, Nevada, for the plaintiff-appellee.

Before: GOODWIN, SNEED and TROTT, Circuit Judges.

TROTT, Circuit Judge.

David Novak ("Novak") appeals his fifteen-month sentence for escaping from the Federal Prison Camp at Nellis Air Force Base ("Nellis"). Novak argues that the clock measuring the duration of his escape should have begun to tick when he was officially designated an escapee by the United States Marshals Service ("U.S.Marshals"), rather than when he actually departed from custody. We disagree. An escape begins when an inmate departs from lawful custody with the intent to evade detection. The district court correctly applied this definition of escape, and accordingly, we affirm Novak's sentence.

## BACKGROUND

The Federal Bureau of Prisons assigned Novak to Nellis after his conviction for bankruptcy fraud. While incarcerated, Novak worked at the Nellis Family Support Center, performing routine cleaning and maintenance tasks. As part of this work detail, Novak was subject to hourly spot-checks by prison officials.

On December 8, 2000, Novak boarded a bus from the prison dormitories to his work location at Nellis. At 8:30 AM, 9:50 AM, and 11:05 AM, Novak was accounted for and present at his work detail. Sometime after the 11:05 AM check, however, Novak slipped away from his work detail. He entered a portable latrine and stripped off his prison khakis to reveal an innocuous white-on-white sweatsuit. Clad now in quotidian Las Vegas garb, Novak surreptitiously crossed a soccer field and made his way out of Nellis through the main gate.

At the 12:00 PM check, Novak was noted as missing, and a localized search began. At 1:10 PM a detail supervisor notified the base officer that Novak was missing. The other 200 prisoners at Nellis were recalled, rounded up, and returned to the prison for a bunk count. At 3:10 PM, Nellis notified the U.S. Marshals that Novak had escaped, and Novak was officially placed on escape status.

After leaving the confines of Nellis, Novak turned left down Las Vegas Boulevard toward a Greyhound bus depot, reflecting upon his escape. Apparently recognizing the error of his ways, Novak called his lawyer in Missouri, his ex-wife, and an ex-neighbor in Phoenix seeking advice about returning to custody. Although Novak thought he knew how to self-surrender, he sought advice to navigate the unforeseen pitfalls of the process.

After reveling in the casino scene on the Las Vegas strip, on Monday, December 11, 2000, Novak called the local United States Attorney, Howard Zlotnick ("Zlotnick"). Unfamiliar with Novak, Zlotnick referred him to the Las Vegas Public Defender's Office. Later that day, Novak called the Public Defender, Alexander Modaber ("Modaber"), who successfully orchestrated Novak's self-surrender to the U.S. Marshals on December 12, 2000 at 2:30 PM.

Novak was charged with one count of escape in violation of 18 U.S.C. § 751(a).[1] He pleaded guilty before the district court without the benefit of a plea agreement. At sentencing, Novak argued he was eligible for a seven-level downward adjustment pursuant to U.S.S.G. § 2P1.1(b)(2)[2] for self-surrendering within ninety-six hours of his escape or, in the alternative, that the district court should use its discretion to

---

1. In pertinent part, 18 U.S.C. § 751(a) reads: Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or United States magistrate judge, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined under this title or

imprisoned not more than five years, or both . . . .

2. U.S.S.G. § 2P1.1(b)(2) provides:

If the defendant escaped from non-secure custody and returned voluntarily within ninety-six hours, decrease the offense level under § 2P1.1(a)(1) by 7 levels or the offense level under § 2P1.1(a)(2) by 4 levels. *Provided*, however, that this reduction shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more.

depart downward under U.S.S.G. § 5K2.0[3] because this case was outside the heartland of escape cases.

Rejecting Novak's story that he "piddled around" at Nellis after departing from his work detail, the district court determined that Novak left Nellis sometime around 11:30 AM on December 8, 2000 and returned to custody at approximately 2:30 PM on December 12, 2000. Accordingly, the district court concluded that Novak self-surrendered after "97, 98 hours to 99 and a half" hours on the lam. As Novak was out of custody longer than ninety-six hours, the district court refused his request for a seven-level adjustment for returning to custody within ninety-six hours.

Nevertheless, the district court adjusted downward two levels for Novak's acceptance of responsibility and departed downward four additional levels because Novak's situation was outside the heartland of escape cases. The district court arrived at a guideline sentence of 12 to 18 months and imposed an actual sentence of 15 months—10 months consecutive and 5 months concurrent to his underlying sentence. The district court also imposed only one year of concurrent supervised release on the escape charge, rather than the 2 to 3 years of supervised release recommended by the Guidelines.

Novak now appeals the district court's refusal to adjust downward seven levels under § 2P1.1(b)(2).

## STANDARD OF REVIEW

■ We review de novo the district court's interpretation and application of the United States Sentencing Guidelines ("Guidelines"). *United States v. Newland,*

116 F.3d 400, 402 (9th Cir.1997). We review for clear error a district court's findings of fact underlying a sentencing decision. *United States v. Buenrostro–Torres,* 24 F.3d 1173, 1174 (9th Cir.1994).

## DISCUSSION

The parties agree that Novak escaped from non-secure custody at Nellis on December 8, 2000 and returned voluntarily at approximately 2:30 PM on December 12, 2000. The parties disagree, however, about when Novak escaped and consequently, whether Novak was entitled to a seven-level downward adjustment for returning to custody voluntarily within ninety-six hours of his escape.

■ The issue of when to start the clock on an escape for the purposes of U.S.S.G. § 2P1.1(b)(2) appears to be one of first impression for the United States Courts of Appeal. Novak argues that his escape began at 3:10 PM on December 8, 2000—the time the U.S. Marshals officially placed him on escape status. The government counters that Novak escaped as of the time he was first discovered missing. Both of these approaches, however, incorrectly focus on the prison officials' awareness of Novak's absence. While coffeehouse philosophers may differ over whether a tree falling in a deserted forest makes a sound, this case poses no such conundrum. We hold that a prisoner "escapes" when he departs from lawful custody with the intent to evade detection, even if no one sees him scale the prison wall, tunnel underground, or wander away from his work detail.

---

**3.** U.S.S.G. § 5K2.0 permits a sentencing court to "impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' "

## A.  U.S.S.G. § 2P1.1

We find support for this understanding of escape in the plain language and grammatical structure of the Guidelines.  Specifically, § 2P1.1(b)(2) provides that, "[i]f the defendant escaped from non-secure custody and returned voluntarily within ninety-six hours, decrease the offense level under § 2P1.1(a)(1) by 7 levels."  "Escape" is not explicitly defined in § 2P1.1, nor anywhere else in the Guidelines, and no Guideline Commentary addresses the timing of an escape.  Nevertheless, the clear emphasis in § 2P1.1(b)(2) is on the actions of the inmate and not on the response of the prison officials.  Tellingly, the Guidelines never mention prison officials.  Rather, it is the "defendant" who is the subject of the sentence, and the defendant's actions alone govern whether he is eligible for the seven-level downward adjustment.  *See* § 2P1.1(b)(2) ("If the *defendant escaped* ... and *returned* ... decrease the offense level ... by 7 levels ....") (emphasis added).

Black's Law Dictionary similarly defines "escape" as "[t]he voluntary departure from lawful custody by a prisoner with the intent to evade the due course of justice."  Black's Law Dictionary 544 (6th ed.1990); *see also United States v. Cluck,* 542 F.2d 728, 731 (8th Cir.1976) (defining "escape" as "a voluntary departure from custody with intent to avoid confinement"); *United States v. Nix,* 501 F.2d 516, 519 (7th Cir. 1974) (same).  These various definitions of "escape" consider only the prisoner's departure from custody, not the responses of the prison officials.  Indeed, to suggest that an inmate escapes when prison officials learn he is missing simply defies our understanding of an escape as well as common sense.[4]  *See United States v. Weaver,* 920 F.2d 1570, 1572 (11th Cir.1991) (finding inmate "escaped by walking away from his assigned work detail").

Novak correctly points out that if he were simply "out of bounds," away from his scheduled work site, only administrative sanctions would apply.  Thus, Novak argues, it follows that his escape began when he was officially placed on escape status, because only then could he have been charged with escape in violation of 18 U.S.C. § 751(a).  Novak argues that this concept of escape results in an objective and uniform standard that can be adapted to any escape scenario, thus obviating the need for evidentiary hearings to determine when an inmate escaped.

As an initial matter, we note that the text of 18 U.S.C. § 751(a) does not require that the U.S. Marshals place an inmate on escape status before charging him with escape.  More importantly, however, Novak's concept of escape places undue and unwarranted importance on the administrative procedures by which the U.S. Marshals officially designate an escapee.  For the purposes of calculating § 2P1.1(b)(2)'s ninety-six-hour window, such procedures are irrelevant;  only the time Novak actually departed from lawful custody matters.

Novak additionally argues that the Eighth Circuit's decision in *United States v. McLemore,* 5 F.3d 331, 332 (8th Cir. 1993) (per curiam), suggests that the time of escape for the purposes of § 2P1.1(b)(2) is the time the inmate is placed on escape status.  The inmate in *McLemore* was furloughed to his wife's residence, where he was to remain at all times.  *Id.* As soon as

---

4.  For example, Andy Dufresne escaped from Shawshank Prison when, just after "lights out," he disappeared into a tunnel hidden behind a poster of lusty Raquel Welch.  That prison officials did not discover Andy's absence until the next morning, by which time he was well on his way to Zihuatenejo, did not change the fact that he had escaped the previous evening.  The Shawshank Redemption (1994).

he departed from his wife's residence without authorization, prison officials knew he had escaped and officially placed him on escape status. *Id.* Although the timing of McLemore's escape and his designation as an escapee were simultaneous, *McLemore* stands not for the proposition that designation of escape status matters, but instead, that an escape commences at the time the inmate departs from lawful custody with the intent to evade detection. If *McLemore* suggests otherwise, we decline to adopt that suggestion as the law of this Circuit. Rather, we expressly hold that an escape begins when an inmate departs from lawful custody with the intent to evade detection.

Here, the district court rejected Novak's account that he remained at Nellis for several hours after he left his designated work site, but before he departed the prison grounds. Instead, the district court correctly found that Novak escaped from Nellis when he left his designated work site with the intent to evade detection at approximately 11:30 AM on December 8, 2000. To support this finding, the district court relied on a mirandized and voluntary statement in which Novak admitted that he left his work detail around 11:30 AM, removed his prison khakis, and departed Nellis through the main gate. Novak's testimony at his change of plea hearing and Nellis's hourly accountability logs also corroborate the district court's finding.[5] Furthermore, the district court found that Novak returned to custody at 2:30 PM on December 12, 2000. The district court, thus, correctly concluded that Novak did not return to custody within ninety-six hours of his escape, and therefore, was not entitled to a seven-level downward adjustment.

## CONCLUSION

An escape begins when an inmate departs from lawful custody with the intent to evade detection. Because Novak returned to custody in excess of ninety-six hours after he escaped, he was not entitled to a seven-level downward adjustment in his sentence. Accordingly, we affirm Novak's sentence.

AFFIRMED.

---

**5.** In addition, Novak appears to argue that the district court failed in its duty under Federal Rule of Criminal Procedure 32(c)(1) to make findings on controverted matters affecting sentencing or to refrain from considering those matters. We disagree. The record clearly reflects that for each contested matter in the presentence report upon which the district court relied, including the time at which Novak escaped, it properly made a specific finding of fact.