**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Manuel GAMEZ, a.k.a. Manuel Gamez–Rubio, Gustavo Gamez, Manuel Flores–Falvez, Manuel Gomez–Rubio, Manuel Flores–Galvez, Defendant–Appellant.**

**No. 00–10307.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 2002.

Filed Aug. 29, 2002.

Victoria A. Brambl, Assistant Federal Public Defender, Tucson, AZ, for the appellant.

Mary Sue Feldmeier, Assistant United States Attorney, Tucson, AZ, for the appellee.

Before: SNEED, BRUNETTI and T.G. NELSON, Circuit Judges.

SNEED, Circuit Judge.

Manuel Gamez appeals his conviction and 151–month sentence for drug importation. Gamez was charged with various marijuana and murder-related offenses. The jury acquitted him on all murder-related charges but found him guilty of all marijuana-related charges. The district court applied U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference to impose a 151–month sentence on Gamez when he otherwise would have been subject to a Guidelines maximum sentence of 46 months. The district court applied the murder cross-reference because it found that murder was both foreseeable and in furtherance of the marijuana importation conspiracy in which Gamez participated even though it found that Gamez did not commit murder. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

On the night of June 2, 1998, Border Patrol Agents Alexander Kirpnick ("Kirpnick") and Steven Heiden ("Heiden") were searching for illegal aliens in Potrero Canyon, north of the Arizona–Mexico border. They saw four men walking in a line, two of whom were walking several feet in front of the others. Each was carrying a bag containing approximately twenty-five pounds of marijuana.

Kirpnick went toward the two smugglers walking in the front of the line. He told them to "sit down." Heiden approached Gamez and another smuggler in the back of the line, both of whom dropped their bags and ran away. Heiden then yelled to Kirpnick that he had found drugs. Kirpnick responded "I know." Five seconds later, one of the smugglers next to Kirpnick shot him in the head. Kirpnick died the next morning. Gamez was not the shooter.[1]

On June 3, 1998, Gamez was arrested after admitting to illegal entry to the United States. He was placed in a cell at the Nogales Border Patrol station at 7:30 a.m. where he remained for the next thirty-one hours. He was fed once. Gamez was not physically or psychologically mistreated. However, he was not advised of his right to contact the Mexican Consulate.

During his detention, Gamez was interrogated on three separate occasions. The first interrogation was conducted by a Spanish-speaking FBI Agent, Robert Gauna ("Gauna"), and Sheriff Roberto Morales ("Morales"). It lasted eighty minutes. Gauna read Gamez his Miranda rights in Spanish. Gamez acknowledged that he understood his rights and signed a Spanish INS waiver form. Gauna told Gamez that a federal officer had been killed close to where Gamez was arrested and that his shoes matched the footprints found at the crime scene. Gauna also told Gamez that he was being investigated for murder.

Gamez confessed to Gauna that he had been recruited by co-defendant Bernardo Velarde–Lopez ("Velarde–Lopez") to smuggle marijuana from Mexico to the United States for $400. He said that Velarde–Lopez was armed with a .38 caliber handgun at the time of the shooting. Gamez knew that Velarde–Lopez was armed with a gun from the beginning of the trip. Gamez, in fact, handled the gun during a water break long before the shooting. Gamez said that when the group was confronted by the Border Patrol, he was third in line and dropped his bag and ran away. Forty seconds later, he heard two gunshots.

The second interrogation was conducted at 5:00 p.m. by another Spanish–Speaking FBI Agent, Jay Galindo ("Galindo") and Morales. It lasted one hour. Galindo read Gamez his Miranda rights in Spanish. Gamez indicated that he understood his rights and signed a waiver form in Spanish. When questioned about Kirpnick's murder, Gamez insisted that Velarde–Lopez must have shot Kirpnick because he was the only one with a gun. Gamez denied any involvement in Kirpnick's murder.

The next morning, June 4, 1998, Gamez was interrogated by another Spanish-

---

1. Gamez was acquitted of all murder-related charges. The district court specifically found that Gamez did *not* shoot Kirpnick. Gamez told the FBI that he was third in line and dropped his bag and ran away upon seeing the Border Patrol. He said that he heard a gunshot approximately forty seconds after he started running. His statement is corroborated by the admission of his co-defendants Velarde–Lopez and Arenas–Hernandez, both of whom told the FBI that Gamez was walking in the back of the line at the time of the shooting. Velarde–Lopez also made a confession, later retracted, that he shot Kirpnick. Velarde–Lopez was convicted of Kirpnick's murder.

speaking FBI agent, Gilbert Garcia ("Garcia"). Garcia told Gamez that he was being investigated for the murder of a Border Patrol agent. Garcia gave Gamez a Spanish polygraph consent form which explained his right not to take the test. Gamez signed the form. He was then subjected to a polygraph test in which he was asked whether he shot Kirpnick or held a revolver in his hands at the time of the shooting. Gamez answered "no" to both questions.

Following the test, Garcia told Gamez that he was going to be charged with murder and that "it would behoove [him]" to identify Kirpnick's shooter. Gamez again reiterated that Velarde–Lopez shot Kirpnick. Gamez also gave detailed directions to Velarde–Lopez's house in Nogales. There was no other source for this information. Utilizing this intelligence, the FBI and the Mexican police were able to arrest co-defendants Velarde–Lopez and Luis Arenas–Hernandez ("Arenas–Hernandez"), both of whom were extradited to the United States for prosecution.

Gamez made his initial appearance before a magistrate on the afternoon of June 4, 1998 at 2:00 p.m. The FBI failed to take Gamez to a magistrate on June 3, 1998 because on that day the first available Spanish-speaking FBI agent arrived at the Border Patrol station at 10 a.m. It was then too late to schedule an appearance before the magistrate. Although it would have been standard procedure for the FBI to take Gamez to the federal prison in Tucson the previous night, the FBI could not do so because all agents in the area were involved in the murder investigation.

Gamez and his co-defendants, Velarde–Lopez and Arenas–Hernandez, were indicted with the following seven counts: (1) conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846 (count 1); (2) possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) (count 2); (3) possession of a firearm during a drug trafficking crime in which death results, in violation of 18 U.S.C. § 924(c)(1) and (j)(1) (count 3); (4) murder of a federal officer while engaged in his official duties, in violation of 18 U.S.C. §§ 1111 and 1114 (count 4); (5) murder of a federal officer during commission of a narcotics felony, in violation of 21 U.S.C. § 848(e)(1)(B) (count 5); (6) conspiracy to import marijuana, in violation of 21 U.S.C. §§ 952(a) and 963 (count 6); and, (7) importation of marijuana, in violation of 21 U.S.C. § 952(a) (count 7).

Subsequently, the district court denied Gamez's motion to suppress his statements to the FBI. It also denied Gamez's motion to dismiss the indictment due to the government's failure to bring him before a magistrate without unnecessary delay.

Following a 15-day trial, the jury found Gamez guilty of counts 1, 2, 6, and 7 of the indictment. It acquitted him on counts 3, 4, and 5 of the indictment.[2] Thus, Gamez was found guilty of all marijuana-related charges but acquitted on all murder-related charges.

Velarde–Lopez was found guilty of Kirpnick's murder and sentenced to two consecutive life terms. Arenas–Hernandez pleaded guilty to counts 1 and 3 of the indictment and was sentenced to 15 years.

The district court sentenced Gamez to 151 months imprisonment followed by 36

---

**2.** Gamez was found guilty of: conspiracy to possess with intent to distribute marijuana (count 1); possession with intent to distribute marijuana (count 2); conspiracy to import marijuana (count 6); and, importation of marijuana (count 7). He was acquitted of: possession of a firearm during a drug trafficking crime in which death results (count 3); murder of a federal officer while engaged in his official duties (count 4); and, murder of a federal officer during commission of a narcotics felony (count 5).

months of supervised release. Although the district court found that Gamez did not murder Kirpnick, it applied the murder cross-reference of U.S.S.G. § 2D1.1(d)(1) to enhance Gamez's sentence by 105 months. It did so because it found that Kirpnick's murder was both foreseeable and in furtherance of the marijuana-importation conspiracy in which Gamez participated.

Gamez appeals his conviction on the ground that his statements to the FBI were involuntary. Gamez also appeals his sentence on the ground that application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference to enhance his sentence by 105 months violated his constitutional rights.

## DISCUSSION

### I. Gamez's Statements to the FBI Were Voluntary.

#### A. Gamez's Pre–Arraignment Delay Did Not Require Suppression of His Statements.

■ Gamez contends that his statements to the FBI during his 31–hour detention should be excluded because they were a product of pre-arraignment delay. Federal Rule of Criminal Procedure 5(a) requires that a person arrested for a federal offense be taken before a magistrate "without unnecessary delay." Fed. R.Crim.P. 5(a). We look to 18 U.S.C. § 3501(c) to determine whether pre-arraignment statements obtained in violation of Rule 5(a) are admissible. *United States v. Van Poyck*, 77 F.3d 285, 288 (9th Cir. 1996), *cert. denied*, 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996).

■ Section 3501(c) creates a six-hour "safe harbor" during which a confession will not be excluded because of delay. *United States v. Alvarez–Sanchez*, 975 F.2d 1396, 1399–1400 (9th Cir.1992), *rev'd on other grounds*, 511 U.S. 350, 114 S.Ct.

1599, 128 L.Ed.2d 319 (1994). A court may exclude statements made outside the six-hour safe harbor if the delay was unreasonable or public policy does not favor admission. *Van Poyck*, 77 F.3d at 289. Neither of these standards suggests that Gamez's statements should be excluded for pre-arraignment delay.

Gamez was brought to the Border Patrol station at 7:30 a.m. He was taken to a magistrate at 2:00 p.m. the next day. Although Gamez's statements fall outside the six-hour safe harbor, his 31–hour detention was reasonable. Gamez did not speak English and could not have been interrogated prior to approximately 10:30 a.m. on the first day of his detention when the first available Spanish-speaking FBI agent arrived at the Border Patrol station. It was impossible to determine with what kind of offense Gamez would be charged prior to interrogating him. The U.S. District Court in Tucson requires advance notification by 10:30 a.m. of each defendant who will be brought to that day's 2:00 p.m. initial appearance. Gamez was therefore brought before a magistrate at the first possible time.

Furthermore, public policy favors admission of Gamez's statements because his interrogation was properly postponed until arrival of an FBI agent who spoke his native language.

#### B. The FBI's Failure to Notify Gamez of His Right to Contact the Mexican Consulate Does Not Require Suppression of His Statements.

■ Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, requires that foreign nationals be informed of their right to contact their consulate upon arrest. However, suppression of statements is not an appropriate remedy for violation of Article 36. *United States v. Lombera–Camorlinga,*

206 F.3d 882, 883–84 (9th Cir.2000) (en banc). Accordingly, the FBI's failure to notify Gamez of his right to contact the Mexican Consulate prior to interrogating him is not a valid basis for suppression of his statements.

### C. Gamez's Statements to the FBI Were Voluntary.

Gamez contends that his statements to the FBI were involuntary because of the coercive nature of his interrogations and the circumstances surrounding his detainment. We think not.

We review de novo the voluntariness of a confession. *United States v. Coleman*, 208 F.3d 786, 790 (9th Cir.2000). However, we review for clear error the district court's factual findings underlying its determination of voluntariness. *United States v. Nelson*, 137 F.3d 1094, 1110 (9th Cir.1998).

The due process voluntariness test takes into account the totality of the circumstances to examine "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (internal quotations and citation omitted). In this regard, 18 U.S.C. § 3501(b) requires that the following factors be considered in determining the voluntariness of a confession:

(1) [T]he time elapsing between arrest and arraignment of the defendant making the confession, ... (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b).

In the case of a foreign national, the voluntariness inquiry also includes assessment of the following factors: (1) whether the defendant signed a written waiver; (2) whether he was read his rights in his native language; (3) whether he appeared to understand those rights; (4) whether he had the assistance of a translator; (5) whether his rights were explained painstakingly; and, (6) whether he had experience with the American criminal justice system. *United States v. Amano*, 229 F.3d 801, 804–05 (9th Cir.2000).

We conclude that Gamez's statements to the FBI were voluntary. As explained above, Gamez's 31–hour detention was reasonable. Gamez was advised by both Gauna and Garcia that he was being questioned for the murder of a Border Patrol officer. The interrogations were conducted in Spanish. Gamez was also read his Miranda rights in Spanish prior to each interrogation. He indicated that he understood his rights and signed a written waiver each time.

That Gamez was without the assistance of counsel does not render his statements involuntary. Gamez was never physically mistreated. Nor was he psychologically coerced into making his statements. Galindo's comment that it would "behoove" Gamez to disclose what he knew about Kirpnick's murder and that this was his "last chance" to come forward does not amount to coercion. *See Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (defining a coerced confession as one made under actual violence or "a credible threat of physical violence"). Nor does the government's failure to feed Gamez more than once render his confessions involuntary. He was of-

fered but declined a drink prior to each interrogation. He never asked for food. At the end of his third interrogation, he asked for water and was given a glass. Although the government should have fed Gamez three meals a day, its failure to do so did not amount to coercion.

We hold that Gamez's statements to the FBI were voluntary and thus admissible. For this reason, we affirm his conviction.

## II. The District Court Properly Applied U.S.S.G. § 2D1.1(d)(1)'s Murder Cross–Reference to Enhance Gamez's Sentence by 105 Months.

We confront the issue whether a sentencing court can apply the murder cross-reference of U.S.S.G. § 2D1.1(d)(1) to enhance a defendant's sentence for a drug-related conspiracy when it finds that murder was both foreseeable and in furtherance of the conspiracy even though the defendant was acquitted of murder and the sentencing court specifically found that he did *not* commit murder. This is an issue of first impression. Because we find that murder was both foreseeable and in furtherance of the marijuana importation conspiracy, and because Gamez's sentence was below the prescribed statutory maximum, we affirm the district court's application of the murder cross-reference.

### A. Gamez's Sentence.

■ The district court, to repeat, sentenced Gamez to 151 months, followed by 3 years of supervised release, for four marijuana-related convictions. Despite its finding that Gamez did not shoot Kirpnick, the district court applied the murder cross-reference of U.S.S.G. § 2D1.1(d)(1) to arrive at a base offense level of 43 for first-degree murder.[3] Had the murder cross-reference not been applied, Gamez would have been subject to a Guidelines maximum sentence of 46 months because his offenses would have been grouped together pursuant to U.S.S.G. § 3D1.2.[4] Thus, by applying the murder cross-refer-

---

**3.** The district court then departed to the second-degree murder base offense level of 33 because it found that Gamez was not the shooter and because his assistance in locating Velarde–Lopez and Arenas–Hernandez was "significant." The district court also made an upward adjustment of 3 points for an official victim and a downward departure of 2 points for acceptance of responsibility. This resulted in a total offense level of 34, which carries a sentence of 151–188 months for a defendant in Criminal History Category I. The district court elected the minimum sentence within this range and sentenced Gamez to 151 months. Gamez was thus sentenced to 60 months imprisonment on counts 1 and 2 (both consecutive), 31 months on count 6 (also consecutive), and 60 months on count 7 (concurrent).

**4.** Each of the four counts on which Gamez was convicted carried a maximum statutory sentence of 60 months imprisonment. *See* 21 U.S.C. §§ 841(a)(1) & (b)(1)(D), 846, 952 and 963. Thus, Gamez faced a statutory maximum sentence of 240 months. Gamez had no prior convictions and was in Criminal History

Category I. Had the murder cross-reference of U.S.S.G. § 2D1.1(d)(1) not been applied and the district court determined Gamez's sentence the same way in all other respects, Gamez's base offense level would have been 20 based on the aggregate quantity of marijuana (100 pounds) smuggled by the four co-conspirators. *See* U.S.S.G. § 2D1.1(c) (drug quantity table subsection (10)); U.S.S.G. § 1B1.3(a)(1)(B), Commentary Note 2 ("[I]n the case of a jointly undertaken criminal activity, [the defendant is accountable for] all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."); *United States v. Ogbuehi*, 18 F.3d 807, 814 (9th Cir.1994). Because Gamez was convicted of multiple counts involving substantially the same harm, his offenses would have been grouped together under U.S.S.G. § 3D1.2(a), and his combined offense level would have been 20. *See* U.S.S.G. §§ 3D1.1(a); 3D1.2(a) ("All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm ... [when they] involve the same victim

ence, the district court enhanced Gamez's sentence by 105 months. It explained that U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference was applicable because there was clear and convincing evidence that Kirpnick's murder was both foreseeable and in furtherance of the marijuana importation conspiracy.

### B. Application of U.S.S.G. § 2D1.1(d)(1)'s Murder Cross-Reference Was Proper Because Kirpnick's Murder Was Both Foreseeable and in Furtherance of the Drug Importation Conspiracy.

■ We review de novo the district court's interpretation of the Guidelines. *United States v. Novak*, 284 F.3d 986, 988 (9th Cir.2002). However, we review for clear error the district court's factual findings underlying its sentencing decision. *Id.*

U.S.S.G. § 2D1.1 sets forth the criteria for determining the offense level for crimes involving drug trafficking. U.S.S.G. § 2D1.1(d)(1) deals with the application of cross-references to drug offenses. It provides: "If a victim was killed under circumstances that would constitute[first-degree] murder ..., apply [the base offense level of 43 for first-degree murder]." U.S.S.G. § 1B1.3(a)(1)(B) provides that in determining whether to apply a cross-reference in the case of a jointly undertaken criminal activity, the sentencing court should consider "*all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,* that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added).

Here, the district court found by clear and convincing evidence that Kirpnick's murder was both foreseeable and in furtherance of the drug trafficking conspiracy for which Gamez was convicted. It also found that Kirpnick's murder occurred during the course of commission of the conspiracy. The district court thus applied the murder cross-reference of U.S.S.G. § 2D1.1(d)(1) pursuant to its relevant conduct determinations under U.S.S.G. § 1B1.3(a)(1)(B).

The record supports the district court's finding that Kirpnick's murder was both foreseeable and in furtherance of the marijuana importation conspiracy. This was a tight conspiracy. Gamez knew that Velarde–Lopez carried a loaded handgun to protect the marijuana. Gamez, in fact, handled the gun during a water break several hours prior to the shooting. It was reasonably foreseeable that Velarde–Lopez would kill a Border Patrol officer who approached the group. Kirpnick's murder was also in furtherance of the conspiracy. It was committed to "avoid detection or responsibility" for the drug importation conspiracy. U.S.S.G. § 1B1.3(a)(1)(B).[5]

and the same act or transaction."); 3D1.3(a) (the "highest offense level applicable to the Group is the offense level of the counts in the Group"); 3D1.4; Presentence Report ¶ 23 (grouping offenses); *Cf. United States v. Gastelum–Almeida*, 298 F.3d 1167, 1175 (9th Cir.2002) (declining to group the offenses of carjacking, alien smuggling and making a false statement because they involved different victims and distinct societal harms). Enhancing this by 3 levels for an official victim and departing downward 2 levels for acceptance of responsibility, as the district court did, Gamez's total offense level would have been 21. The Guidelines provide a sentence of 37–46 months for a defendant who is in Criminal History Category I and has an offense level of 21.

5. In this regard, the Application Notes to U.S.S.G. § 1B1.3 explain:

[T]he criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two de-

That Gamez did not pull the trigger is of no moment. Gamez actively participated in the drug importation conspiracy and was fully aware of its consequences. He was paid $400. A Border Patrol officer was shot in the head at close range. Gamez's 151–month sentence is also below the prescribed statutory maximum (240 months) for his convictions. It is not an extreme sentence for the crime committed.

We conclude that the district court's application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference to enhance Gamez's sentence by 105 months was proper in light of the fact that Kirpnick's murder was both "reasonably foreseeable" and "in furtherance" of the drug trafficking conspiracy in which Gamez participated. U.S.S.G. § 1B1.3(a)(1)(B). Our decision is supported by Supreme Court precedent affirming sentencing enhancements based on relevant conduct determinations. *See Harris v. United States*, — U.S. —, —, 122 S.Ct. 2406, 2414, 153 L.Ed.2d 524 (2002) ("[J]udges exercise their sentencing discretion through an inquiry broad in scope, largely unlimited either as to the kind of information they may consider, or the source from which it may come.") (internal quotations and citation omitted); *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."); *Witte v. United States*, 515 U.S. 389, 402–403, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); *McMillan v. Pennsylvania*, 477 U.S. 79, 92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) ("Sentencing courts necessarily consider

the circumstances of an offense in selecting the appropriate punishment, and we have consistently approved sentencing schemes that mandate consideration of facts related to the crime without suggesting that those facts must be proved beyond a reasonable doubt.") (citation omitted).

Other Circuits have rejected constitutional challenges to the application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference to enhance a defendant's sentence for drug trafficking even though the defendant was not convicted of murder. *See United States v. Martinez–Medina*, 279 F.3d 105, 121–23 (1st Cir.2002), *cert. denied*, — U.S. —, 122 S.Ct. 2608, 153 L.Ed.2d 794 (2002) (imposing a life sentence on two defendants convicted of conspiracy to import cocaine because the first defendant "ordered the murder" of an individual, and the second defendant "was responsible" for the murder of three others); *United States v. Padro Burgos*, 239 F.3d 72, 77 (1st Cir.2001), *cert. denied*, 533 U.S. 910, 121 S.Ct. 2259, 150 L.Ed.2d 245 (2001) (imposing a life sentence on a defendant convicted of cocaine trafficking because the defendant was "responsible" for the murder of two rival gang members); *United States v. Meyer*, 157 F.3d 1067, 1073, 1081–82 (7th Cir.1998) (imposing a life sentence on a defendant convicted of conspiracy to distribute cocaine because the defendant had murdered an individual, had directed another to murder a second individual, and had been involved in disposing of the bodies); *United States v. Crump*, 120 F.3d 462, 468 (4th Cir.1997) (imposing a life sentence on a defendant convicted of conspiracy to distribute cocaine because the defendant attempted to

---

fendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim ... because

the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity....
U.S.S.G. § 1B1.3 Application Note 2.

rob a drug dealer and in the process "pulled the trigger that killed the victim.").

■ That Gamez did not shoot Kirpnick does not foreclose application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference. Neither U.S.S.G. § 2D1.1(d)(1), nor U.S.S.G. § 1B1.3(a)(1)(B) require a sentencing court to find that the defendant in fact committed murder in order to apply the cross-reference. All that they require is that the court find that murder occurred in the course of commission of a drug-related conspiracy and that it was reasonably foreseeable and in furtherance of the conspiracy. We hold that application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference does not require a factual finding by the sentencing court that the defendant in fact committed murder or played a major role in its commission. So long as the sentencing court finds that murder was both reasonably foreseeable and in furtherance of the drug-related conspiracy, application of the murder cross-reference is proper.

Gamez next claims that the district court erred in imposing consecutive sentences. However, the Guidelines authorize imposition of consecutive sentences in cases involving multiple-count convictions "to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d). In this case, the to-tal punishment was 151 months. The district court's imposition of consecutive sentences amounting to 151 months was therefore proper.

Gamez also contends that the plain language of U.S.S.G. § 2D1.1(d)(1) limits its application to murders occurring outside the territorial and maritime jurisdiction of the United States. We need not decide the merits of Gamez's contention because jurisdiction to prosecute Gamez and apply the murder cross-reference exists in this case by virtue of the murder of a federal officer while engaged in his official duties.[6]

■ Gamez further claims that application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference placed him in double jeopardy because he was acquitted of both murder and of conspiracy to commit murder. The Supreme Court rejected this argument in *Witte v. United States.* It held: "To the extent that the Guidelines aggravate punishment for related conduct outside the elements of the crime . . ., the offender is still punished only for the fact that the *present* offense was carried out in a manner that warrants increased punishment, not for a *different* offense. . . ." *Witte,* 515 U.S. at 402–403.

■ Gamez also argues that his 151–month sentence violates the Eighth Amendment prohibition against cruel and

---

**6.** *See* 18 U.S.C. § 1114 ("Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties . . . shall [in the case of murder] be punished . . . under section 1111"); *United States v. Harris,* 238 F.3d 777, 778–79 (6th Cir.2001), *cert. denied,* 533 U.S. 908, 121 S.Ct. 2254, 150 L.Ed.2d 240 (2001) (applying the murder cross-reference of U.S.S.G. § 2B3.1(c)(1) which contains identical language to U.S.S.G. § 2D1.1(d)(1) to a defendant who in the course of committing robbery killed a soldier at a U.S. Army Base defined under 18 U.S.C. § 7 as within U.S. territorial jurisdiction); *see also* U.S.S.G. § 3A1.2(a) (providing an official victim enhancement for injuring a "government officer or employee"); *see generally United States v. Corey,* 232 F.3d 1166, 1171–72 (9th Cir.2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 198, 151 L.Ed.2d 140 (2001) (18 U.S.C. § 7 "as a whole extends the jurisdiction of the United States to the ends of the earth (and beyond). . . . [S]ubsection 7(3) applies to Americans in all territory, wherever situated, that is acquired for the use of the United States and under the exclusive or concurrent jurisdiction of the federal government.").

unusual punishment. There was no such violation. Gamez was convicted of four marijuana-related charges and faced a statutory maximum sentence of 240 months. The district court sentenced him to 151 months. This was within the statutory prescribed range. Nor was the sentence grossly disproportionate to the crime committed. A Border Patrol officer was shot in the head. That Gamez did not pull the trigger does not render his sentence cruel and unusual punishment. *See United States v. Cupa–Guillen*, 34 F.3d 860, 864 (9th Cir.1994) ("[A] sentence within the limits set by a valid statute may not be overturned on appeal as cruel and unusual punishment unless the sentence is so grossly out of proportion to the severity of the crime as to shock our sense of justice.") (internal quotations and citations omitted).

Finally, Gamez contends that the district court's application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference to enhance his sentence by 105 months without submitting the enhancing factors to the jury for proof beyond a reasonable doubt violated his right to due process and to trial by jury. In support of his position, Gamez relies on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000), and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

*Jones* held that provisions of a carjacking statute that established higher penalties when the offense resulted in serious bodily injury or death set forth additional elements of the offense rather than sentencing factors. Those elements had to be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt. *Jones*, 526 U.S. at 243–44, 252. Similarly, *Castillo* held that provisions of a criminal statute that created offense elements rather than sentencing factors had to be determined by a jury. *Castillo*, 530 U.S. at 131.

Unlike *Jones* and *Castillo*, the instant case does not involve a criminal statute that provides steeper sentences for variants of a crime. Instead, it involves application of a cross-reference provided by the Guidelines to enhance a defendant's sentence based upon aggravating circumstances surrounding the crime committed. Gamez need not be found guilty of murder in order to receive a higher sentence for his drug trafficking convictions. The Guidelines simply require that the sentencing court find that murder was both reasonably foreseeable and in furtherance of the drug trafficking conspiracy. These findings need not be made by a jury. As held in *Jones:* "It is not, of course, that anyone today would claim that every fact with a bearing on sentencing must be found by a jury; we have resolved that general issue and have no intention of questioning its resolution." *Jones*, 526 U.S. at 248.

Nor does *Apprendi* aid Gamez. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Although application of U.S.S.G. § 2D1.1(d)(1)'s murder cross-reference enhanced Gamez's base offense level to 43 (which carries a life sentence), Gamez was sentenced to 151 months. His sentence was below the prescribed statutory maximum of 240 months for his drug-related convictions. Therefore, the district court's factual findings that murder was both foreseeable and in furtherance of the drug trafficking conspiracy, requisite for application of U.S.S.G. § 2D1.1(d)(1), did not have to be submitted to a jury and proved

beyond a reasonable doubt. *See Harris*, —— U.S. at ——, 122 S.Ct. at 2419 ("[I]t is beyond dispute that the judge's choice of sentences within the authorized range may be influenced by facts not considered by the jury.... That a fact affects the defendant's sentence, even dramatically so, does not by itself make it an element."); *United States v. Buckland*, 289 F.3d 558, 570 (9th Cir.2002) (en banc) ("*Apprendi* does not alter the authority of the judge to sentence *within* the statutory range provided by Congress"). This is evident from the Supreme Court's holding in *Apprendi* that in determining whether a particular factual finding is a sentencing factor or a substantive element of the offense in question, "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494. In this case, the district court's relevant conduct determinations did not expose Gamez to a penalty greater than that authorized by the jury's verdict. Therefore, *Apprendi* was not implicated.

We thus affirm Gamez's sentence.

AFFIRMED.