**SELINA ROPATI, Appellant,**

**v.**

**AMERICAN SAMOA GOVERNMENT, Appellee.**

High Court of American Samoa
Appellate Division

AP No. 04-03

July 27, 2004

Before KRUSE, Chief Justice, GOODWIN,[*] Acting Associate Justice, TASHIMA,[**] Acting Associate Justice, ATIULAGI, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Appellant, Sachin Mehta, Assistant Public Defender
 For Appellee, Jeremy T. Kirkland, Assistant Attorney General

OPINION

Appellant Selina Ropati appeals from her conviction, after trial by jury, for the second-degree murder of her newborn infant. She contends that her conviction cannot stand because the prosecution failed to introduce enough proof of her guilt apart from her confession. In addition, she argues that the trial court should have excluded her written confession because the prosecution did not meet its burden of proving that her confession was voluntary.

Following the denial of a timely a motion for a new trial, she filed a timely notice of appeal. *See* A.S.C.A. § 46.2402. We therefore have jurisdiction over her appeal.

### Factual and Procedural Background

Ropati is originally from Samoa. She moved to American Samoa in 2001 and lived with her sponsor, Junior Gaisoa, and his wife. At some point after arriving in American Samoa, Ropati discovered that she was pregnant. She did not tell the Gaisoas, however, out of fear that they would beat her and send her back to Samoa. On the evening of May 8, 2002, Ropati gave birth in an outside bathroom behind the Gaisoas' home. The baby died that evening, and Ropati placed the body in a sack and hid it in a rock outcropping.

The following day, the wife of a neighbor who had heard the sound of a baby crying the night before asked Ropati if she had given birth. Ropati said she had, but that she was afraid of the Gaisoas finding out. She told the neighbor that the baby had fallen out of her, and that she had buried the body nicely in the plantation. When she led three of her neighbors to

---

[*] Honorable Alfred T. Goodwin, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of the Interior.
[**] Honorable A. Wallace Tashima, Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of the Interior.

the body, however, it was unbathed and inside a pig feed sack in a rock outcropping. One of the neighbors cut the baby's umbilical cord, which was wrapped around the baby's neck. The neighbor also bathed the baby and wrapped it in a sheet in accordance with Samoan customs.

Later that day, after the police were informed about the dead baby, two officers took Ropati to the hospital. One of the officers, Sergeant Simanu, gave Ropati some police forms on which to make a statement. Ropati was released from the hospital a day and a half later. On May 13, Sergeant Simanu and Detective Sagapolutele went to Ropati's home and took her to the police station to make a statement. While at the station, Ropati wrote a statement in which she admitted choking the infant to death. After she made the statement, the police took her back to her home.

The facts recited so far are largely undisputed. The two areas of disagreement between Ropati and the government concern how her baby died and the circumstances surrounding her confession. Ropati described the birth of her baby and its death as follows:

> I again felt pain in stomach, but the pain did not last for long periods of time. Then I went back to the house and sat on the steps. I was feeling hot again and I wanted to take another shower. So I went back to the bathroom and showered. While I was having that shower, I felt pain in my stomach again, but it did not last long. And while I was taking a shower, I felt an urge to go and use the bathroom, And while I was walking to the bathroom, I felt the water breaking. I felt the pain, but the pain was not intense, and the water was breaking and was coming out very strongly and the water came out with it—and the baby came out with it. The water was coming out very strongly, and it brought the baby out with it, and I couldn't stop it because I had not sat down by then when that happened. I heard the baby cried, but it did not cry for even a minute. After it fell down, I did not hear it cry again, and so I picked it up and tried to do something to it, to make it cry again, but nothing happened. It fell down and its head struck the floor of the bathroom. I picked it up and turned it up side down and shook it to see if it would cry again. I also turned him over—turned it over and shook it to see if it would cry, but it did not. I was very frightened by then, and I couldn't reveal that to the couple because I couldn't do anything more because the baby was dead. I then obtained a sac that was inside the bathroom, and I wrapped the baby with it, I left it in the bathroom and went back to the house for a cup of tea because I was—I was beginning to faint. A short while later, I went back down to the bathroom to check on it. And in the early morning, I went

back out there, wrapped it nicely then took it to a hole in a huge outcropping in the back.

The government did not believe Ropati's version of the events. It called Dr. Roel Cayari, the pathologist who had performed the autopsy on Ropati's baby, who testified that although the baby had a minor hemorrhage on its scalp, this was most likely caused by the delivery itself. He further testified that even if the hemorrhage was caused by a fall to the floor, it had nothing to do with the baby's death. Rather, the baby was born alive and died of asphyxiation.

Dr. Cayari could not determine, however, whether the asphyxiation was due to natural or unnatural causes. On the one hand, the baby's lungs were clear and well-aerated, and there was no evidence that the asphyxiation was due to natural causes such as blockages in the nose, mouth, or throat or the swallowing of mucous, blood, or amniotic fluid. On the other hand, there was no evidence of trauma to the baby's neck, and choking usually leaves some evidence of contusions on the soft tissues. In short, although there was no evidence that the asphyxiation was due to natural causes, there was also no evidence that the baby had been strangled.

Whereas the autopsy findings were inconclusive, Ropati's confession was not. The trial court admitted into evidence a written statement that Ropati had signed at the police station. In the statement, Ropati admitted that she had choked her baby to death.

The other area of contention was whether Ropati had given her confession voluntarily, or whether she had been arrested illegally and coerced into giving a false confession. According to Ropati, she wrote out a statement on the forms that Sergeant Simanu had given her at the hospital, and in that statement she had described the baby's death as accidental. Both of the Gaisoas testified that Ropati had shown them this statement and they had read it. Ropati testified that she gave the statement to Sergeant Simanu when Simanu and Detective Sagapolutele came to pick her up to bring her to the police station on May 13, 2002. Simanu asked Ropati three times if she had choked her baby, and she replied "no" each time. Sagapolutele then yelled at her angrily and told her that she would not be allowed to return home if she did not admit to choking the baby. After she complied and wrote that she had choked the baby, the officers drove her home.

Sergeant Simanu and Detective Sagapolutele recounted a markedly different version of these events. Simanu testified that she gave Ropati a statement form to fill out at the hospital but never got these forms back from Ropati. When Simanu went to pick up Ropati on May 13, Ropati said that the statement was incomplete. Simanu told her that she could

leave those papers at home. Simanu asked Ropati if she would be willing to come to the police station to make a statement, and Ropati agreed to do so. At the station, Simanu explained to Ropati that she was free to leave at any time, but Ropati said she wanted to talk. After Ropati signed a form waiving her *Miranda* rights, she wrote out the statement in which she confessed to choking the baby. Simanu and Sagapolutele denied yelling at Ropati or in any way coercing her into making the statement.

After she was charged with second-degree murder, Ropati filed a motion to suppress her confession on the grounds that it was involuntary. She also argued that, even though the police advised her of her *Miranda* rights and she had waived them, her confession was the fruit of an illegal arrest and must be excluded under American Samoa's constitutional exclusionary rule. After an evidentiary hearing, the Trial Division denied the motion to suppress. After trial, the jury found her guilty of second-degree murder, and she was sentenced to 21 years' imprisonment.

## Standard of Review

■■■ The voluntariness of a confession is reviewed *de novo*. *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir, 2002), *cert. denied*, 538 U.S. 1067 (2003). The trial court's factual findings underlying its determination of voluntariness are reviewed for clear error. *See* A.S.C.A. § 46.2403 (providing that findings of fact may not be set aside on appeal unless they are clearly erroneous); *Gamez*, 301 F.3d at 1144. Clear error review requires a reviewing court to accept the lower court's findings of fact unless the reviewing court has a "definite and firm conviction that the court below committed a mistake." *Roman Catholic Diocese of Samoa Pago Pago v. Avegalio*, 20 A.S.R.2d 70, 73 (App. Div. 1992); *accord Easley v. Cromartie*, 532 U.S. 234, 242 (2001). Credibility determinations are owed even greater deference. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

■■ A claim that the government did not adduce enough independent evidence to corroborate a defendant's confession is reviewed *de novo*. *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir, 2000). The evidence is viewed in the light most favorable to the prosecution. *Id.* at 979.

## Analysis

I. **Did the Trial Division Err in Admitting Ropati's Confession into Evidence?**

Ropati argues that the Trial Division erred in admitting her confession into evidence, because the government did not prove by a preponderance of the evidence that her confession was voluntary and not the fruit of an

illegal arrest. Ropati contends that she and Officers Simanu and Sagapolutele presented two equally credible but contradictory versions of events, and therefore the government could not have met its burden of proof.

The Trial Division held an evidentiary hearing at which it heard testimony from, among others, Ropati and the investigating officers. With regard to whether Ropati was the subject of an illegal arrest, the Trial Division found that she voluntarily accompanied the police officers to the police station. Although the Trial Division did not call this a credibility determination, the court had nothing more to go on than the conflicting testimony of Ropati and the two officers. With regard to the voluntariness of her confession, the court stated that "Ropati's version of those events is unpersuasive, and we find the police versions credible."

Although Ropati gave a consistent version of events in her testimony, and although her attorney impeached Sergeant Simanu's credibility somewhat with a prior inconsistent statement, the Trial Division's factual findings are not clearly erroneous. Where, as here, a trial court's finding "is based on [a] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *City of Bessemer City*, 470 U.S. at 575. The Trial Division did not err in admitting Ropati's confession.

## II. Did the Trial Division Err in Ruling that Ropati's Confession was Sufficiently Corroborated by Independent Evidence?

Ropati contends that even if her confession was admissible, her conviction must still be reversed because there was a complete lack of independent evidence to corroborate her confession.

It is well established that a defendant may not be convicted on the basis of her own uncorroborated confession. *See Smith v. United States*, 348 U.S. 147, 152-53 (1954). This rule is grounded in a concern that "a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964).

Less established, however, is the quantum of evidence necessary to corroborate a confession. In *Opper v. United States*, 348 U.S. 84 (1954), the Supreme Court "rejected the traditional *corpus delicti* rule and held that the prosecution need not introduce independent evidence of every element of the crime." *United States v. Lopez-Alvarez*, 970 F.2d 583,

591 (9th Cir. 1992). Rather, the government must

> introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth.

*Opper,* 348 U.S. at 93 (citation omitted).[1] In a case decided the same day as *Opper,* the Supreme Court held that "the corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed . . . ." *Smith,* 348 U.S. at 156. One method of corroboration, however, "is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Id.* Later, in *Wong Sun v. United States,* 371 U.S. 471 (1963), the Court stated in dicta that "[w]here the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable." *Id.* at 491, n.15.

These cases do not clearly answer the question that is central to this appeal. Namely, must the corroborative evidence independently support the essential facts of the offense, or is it enough that the corroboration bolsters the confession itself? The Ninth Circuit, for example, has held that the government must introduce enough evidence to establish *both* (1) "that the criminal conduct at the core of the offense has occurred" and (2) that the confession is trustworthy. *Lopez-Alvarez,* 970 F.2d at 592. In a later opinion, however, the Ninth Circuit held that the corroborating evidence does not need to *establish* the gravamen of the offense. *See Corona-Garcia,* 210 F.3d at 979. Rather it needs only to fortify, augment, or support the confession such that a jury may infer that the confession is trustworthy. *Id.*

The Trial Division adopted this latter view, which appears to be shared by a majority of other U.S. Courts of Appeals. *See United States v. Fujii,* 301 F.3d 535, 541 (7th Cir. 2002) (holding that "all that is necessary is for the government to present extrinsic evidence tending to corroborate the confession, [and then] the confession as a whole is admissible, and

---

[1] In *Opper,* the Supreme Court adopted the "trustworthiness" corroboration rule as an evidentiary rule for the federal courts, not as a constitutional requirement. *Opper,* 348 U.S. at 93.

some elements of the offense may be proven entirely on the basis of [the] corroborated confession") (internal quotation marks and citation omitted) (alterations in original); *United States v. Singleterry,* 29 F.3d 733, 737 n. 3 (1st Cir. 1994) (noting that "in the absence of independent evidence of the *corpus delicti* the government may establish the trustworthiness of the confession with other evidence typically used to bolster the credibility and reliability of an out-of-court statement"); *United States v. Treas-Wilson,* 3 F.3d 1406, 1409 (10th Cir. 1993) (stating that "[i]n *Opper,* the Court abandoned the independent proof requirement, instead requiring only that the evidence tend to establish the trustworthiness of the confession"); *Gov't of Virgin Islands v. Harris,* 938 F.2d 401, 409-10 (3d Cir. 1991) (noting that "[u]nder the 'trustworthiness' doctrine, direct proof of the *corpus delicti* is not required; the evidence may even be collateral to the crime itself"); *Fallada v. Dugger,* 819 F.2d 1564, 1570 (11th Cir. 1987) (holding that "[w]hile all elements of an offense established by admissions must be corroborated, it is sufficient if the corroboration merely fortifies the truth of the confession without independently establishing the crime charged"); *United States v. Micieli,* 594 F.2d 102, 108-09 (5th Cir. 1979) (holding that "one available mode of corroboration is for the extrinsic evidence to bolster the admission itself"); *United States v. Davis,* 459 F.2d 167, 171 (6th Cir. 1972) (quoting *Smith* for the proposition that independent evidence may bolster the confession itself and thereby prove the offense); *Scarbeck v. United States,* 317 F.2d 546, 566 (D.C. Cir. 1962) (holding that "if the independent evidence is sufficient to establish the truth, trustworthiness and reliability of the accused's statements to the investigating authorities, and the statements themselves supply whatever elements of the offense are not proved by the independent evidence, the proof is sufficient to send the case to the jury").

A majority of states, however, have retained the traditional *corpus delicti* rule that the corroboration must relate to the crime itself rather than the confession. *See* 1 *McCormick on Evidence* § 145, at 557 (John W. Strong ed., 4th ed. 1992); 29A AM. JUR. 2D *Evidence* §§ 753, 1472 (1994); Maria Lisa Crisera, *Reevaluation of the California Corpus Delicti Rule. A Response to the Invitation of Proposition 8,* 78 Cal. L. Rev. 1571, 1573 n.15 (1990) (indicating that five states have abandoned the traditional *corpus delicti* rule in favor of the federal trustworthiness doctrine); B.H. Schopler, Comment Note, *Corroboration of Extrajudicial Confession or Admission,* 45 A.L.R.2d 1316, § 7[a] (1956). Under the most common formulation of this rule, the prosecution must, at a minimum, independently show: "(a) the injury or harm constituting the crime occurred; [and] (b) this injury or harm was done in a criminal manner." 1 *McCormick on Evidence* § 145, at 557.

■ We conclude that the trustworthiness doctrine is the better rule; accordingly, we hold that the evidence was sufficient to corroborate

Ropati's confession. As the Trial Division noted, Ropati confessed to strangling the baby several days before the pathologist discovered that the baby had died from asphyxiation. In addition, she testified at trial that the baby died when it hit its head on the floor, but the autopsy showed asphyxiation as the cause of death. Although the defense suggested that the baby may have asphyxiated *in utero* or been strangled by the umbilical cord, the evidence did not support this theory. First, Dr. Cayari testified that the baby had been born alive and that its lungs were clear and well-aerated. Second, although the baby was found with the umbilical cord wrapped around its neck, a neighbor heard a baby crying for two to three minutes on the evening of the birth and Ropati herself testified that the baby had cried. Finally, although the fact that Ropati put the body in a sack and placed it in a rock outcropping is consistent with her simply having wanted to conceal the birth, it also has some tendency to show a consciousness of guilt.

The implausibility of some of Ropati's testimony provided further corroboration. For example, her seeming unfamiliarity with labor pains is hard to believe in light of the fact that this was not the first time she had given birth. Also, on direct examination Ropati testified that the baby fell out of her, hit its head, and died. In this scenario, it is difficult to imagine how the baby would have had time to cry for less than a minute (according to Ropati's testimony) or for 2-3 minutes (according to the neighbor's testimony). On cross-examination, however, Ropati testified that the baby cried after falling and hitting its head, that she then fainted, and when she regained consciousness the baby was not breathing. She shook the baby and got no response, so she assumed the baby was dead without checking for a pulse (or calling for help).

The foregoing evidence, although far from overwhelming, was sufficient to bolster the trustworthiness of Ropati's confession, especially when the evidence is viewed in the light most favorable to the prosecution. Thus, there is sufficient evidence, in the form of the corroborated confession, to sustain the jury's verdict.

## Conclusion

For the foregoing reasons, the Trial Division's judgment of conviction is AFFIRMED.