UNITED STATES of America,
Plaintiff–Appellee,

v.

Lamar TREAS–WILSON,
Defendant–Appellant.

No. 92–2196.

United States Court of Appeals,
Tenth Circuit.

Aug. 31, 1993.

Jose R. Coronado, Las Cruces, NM, for defendant-appellant.

Robert J. Gorence, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., with him on the brief), Albuquerque, NM, for plaintiff-appellee.

Before LOGAN, ANDERSON, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Lamar Treas–Wilson, a twenty-year-old Mescalero Apache Native American, appeals his conviction of first degree murder in violation of 18 U.S.C. §§ 1153 and 1111(a). We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

### I. Background

At nine o'clock on the evening of January 25, 1991, Sandra Smith left her nine-year-old son, Kelvin Davis, in charge of his younger siblings: six-year-old Desiree and her friend Toni, five-year-old Francis, and two-year-old Rayford. Ms. Smith went out for drinks with a friend after instructing Kelvin not to open the door to strangers and to call a neighbor if any problems arose. Ms. Smith met with her common law husband of seven years, Francis Rocha, in the parking lot of

the tribal bar. They continued drinking at various places until they returned home around two or three o'clock in the morning. Both were under the influence of alcohol.

Upon their return, they discovered that the front window had been broken and, after a hurried search around the house, that Kelvin was missing. They woke Desiree to ask if she knew where Kelvin was; she responded, "That man took him." Mr. Rocha and Ms. Smith argued about the children being left alone without a baby-sitter and called the Mescalero Police Department to report a possible break-in. The police department did not take seriously Ms. Smith's first call because of her inebriation. After a second call, however, Officer Alfred La Paz arrived, called for assistance, and sequestered the family to avoid disturbing evidence.

The police department assembled the local volunteer search-and-rescue team, which began the search for Kelvin at dawn. Searchers soon discovered his body in the woods behind the house, covered by branches and a large log. A trail of blood led from the body to a concrete slab near the Rocha house. The body was unclothed except for a blood-soaked white T-shirt pulled up around the neck. The body had a number of abrasions consistent with dragging by the T-shirt, two knife wounds, and several contusions. The first knife wound was a relatively shallow puncture, located on the neck behind the right ear. The second wound, the cause of death, was a ragged four-inch incision which severed the esophagus, trachea, and large veins of the neck and extended into the fifth vertebra.

Federal Bureau of Investigation ("FBI") agents arrived later that morning and conducted a thorough investigation of the area. They discovered a large quantity of blood on the concrete slab, a smaller quantity of blood immediately outside the house, a six-inch pool of blood in the living room, and drops of blood on the bannister. A search for fingerprints was unsuccessful, and an attempt to cast footprints of the assailant failed because the ground was frozen. The only eyewitness evidence obtained was from Desiree, who said that the man in the house was dressed in black and resembled her father. The FBI, however, subsequently eliminated Mr. Rocha as a suspect. Having neither a suspect nor good leads, the FBI investigation stalled.

The case broke two months later when the defendant, Lamar Treas–Wilson, confessed to the killing. Treas–Wilson ultimately confessed six separate times. The first five confessions were oral confessions; the sixth was written. He does not contest the voluntariness of those confessions.

Treas–Wilson first confessed to a friend, Danny Kanseah. The initial confession consisted of a statement that he had committed the murder and that he could not "hold it inside of him anymore." Treas–Wilson asked Mr. Kanseah not to reveal his confession to anyone, a request that Mr. Kanseah honored. A week later, after drinking for much of the afternoon, Treas–Wilson repeated his confession and elaborated on the details. He told Mr. Kanseah that he dragged the boy out of the house and slit his neck. When asked why he did it, Treas–Wilson simply replied that the victim had angered him once while at Ski Apache, a local ski area where he worked as a lift operator. Treas–Wilson added that he had been contemplating suicide and asked Mr. Kanseah not to tell anyone about the confession.

Treas–Wilson's third confession took place at a social gathering at the home of Marci and Manuel Ortiz. At this time, Mr. Kanseah told Treas–Wilson to tell the people there what he had told him. Treas–Wilson did so, confessing to the killing and explaining in moderate detail the circumstances to Marci, Manuel, friend Saffie Ortega, and his mother, Lanelle Wilson. The defendant told the group that he chased the children upstairs, grabbed the little boy, and threw him out the window. He related stabbing the victim in the neck and said he could remember slicing the victim's neck. Treas–Wilson also said he was blacking out frequently during this time. His mother begged him to be quiet, but he continued to confess his involvement.

After learning that Treas–Wilson was making statements about the murder, the

FBI questioned him. During an interview in the Wilson home, Treas–Wilson confessed to the murder of Kelvin Davis for the fourth time. He told the FBI that he had consumed four to five six-packs of beer the day of the murder and, though he was blacking out occasionally, that he remembered killing Kelvin Davis. Treas–Wilson said he was wearing a black jacket, black pants, and a black headband. He said that he broke into the house and dragged the boy through the kitchen and out the door. Although he could not remember beginning the fatal knife incision, he did remember pulling the blade from the neck, a process he described in detail. Treas–Wilson also provided the FBI with the clothes he believed he wore that night to be tested for the presence of blood.

The FBI returned several days later to reinterview Treas–Wilson. They took Treas–Wilson to the crime scene, where he volunteered more specific knowledge. He pointed out the trail along which he dragged the body, even though twelve trails led through the area. Although he did not pinpoint the resting place of the body, he missed the exact location by only twenty yards. Treas–Wilson described the events that transpired within the house in great detail. He broke the window with a rock or log, entered the house, and saw Kelvin Davis on the couch. He tripped in the living room and had to put his hand down on a table to steady himself. He dragged Kelvin Davis off the couch by his white T-shirt, at which time the boy cried, "No, no." He also noted that the furniture had been rearranged since he had broken in. Treas–Wilson told the FBI that, after pulling Kelvin through the kitchen, he stabbed the boy twice. Treas–Wilson demonstrated how he made the fatal incision, showing that it was made at the concrete slab where copious amounts of blood were found. He described dragging the boy by his white T-shirt and showed how the body was covered with branches, sticks, and a large log which he estimated to weigh seventy pounds. Finally, he described peeling dried blood off his hands as he walked home. After providing this extensive oral testimony, Treas–Wilson accompanied the FBI for fingerprinting. He also completed a written confession which was similar to the oral testimony given that afternoon, although less detailed.

Treas–Wilson recanted his confessions at trial, claiming that they were the fabrications of a depressed and suicidal young man who perceived prison life as an attractive alternative to his desperate circumstances on the reservation. He testified that he had been depressed since the death of his father several months earlier and that he had trouble with alcohol. The jury did not believe Treas–Wilson's explanation and convicted him of first degree murder. Treas–Wilson moved pursuant to Fed.R.Crim.P. 29(c) for a judgment of acquittal, contending that the government presented insufficient evidence to support the conviction and that he was unfairly prejudiced by the admission of gruesome autopsy and crime scene photographs. The district judge denied the motion. Treas–Wilson appeals that decision.

## II. Sufficiency of the Evidence

Treas–Wilson asserts that the evidence was insufficient to establish either that he was the murderer or, alternatively, that he committed the murder with premeditation. The government concedes that no eyewitness or physical evidence identifies Treas–Wilson as the killer. Rather, the government relies upon Treas–Wilson's six out-of-court confessions to prove his identity as the killer. In addition, the government relies on both the confessions and the details of the killing to establish premeditation. In reviewing the evidence to determine if it supports a jury's verdict, we inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

As a threshold matter, the parties debate whether Treas–Wilson's confessions were sufficiently corroborated to sustain the conviction. An uncorroborated extrajudicial confession is not sufficient to sustain a criminal conviction. *Smith v. United States*, 348 U.S. 147, 152, 75 S.Ct. 194, 197, 99 L.Ed. 192

(1954). Rather, independent evidence must support "the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954); *see also United States v. Chimal,* 976 F.2d 608, 611 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1331, 122 L.Ed.2d 715 (1993). At trial and on appeal, both the government and the defendant focused our attention on the details of the various confessions, arguing over whether Treas–Wilson's confessions were trustworthy because they included information that "only the killer would know." The parties, however, read the corroboration rule too broadly.

■ At its inception, the corroboration rule required that, "[i]n order to convict of serious crimes of violence, then capital offenses, independent proof was required that *someone* had indeed inflicted the violence, the so-called *corpus delicti.*" *Smith,* 348 U.S. at 153–54, 75 S.Ct. at 198. In *Opper,* the Court abandoned the independent proof requirement, instead requiring only that the evidence tend to establish the trustworthiness of the confession. 348 U.S. at 93, 75 S.Ct. at 164; *see also Chimal,* 976 F.2d at 610. The trustworthiness requirement, however, still extends only to the corpus delicti, not the identity of the accused.[1] *See United States v. Wilson,* 529 F.2d 913, 915 (10th Cir.1976). For a murder case such as this, the Supreme Court stated the rule as follows:

> Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it.

*Wong Sun v. United States,* 371 U.S. 471, 489 n. 15, 83 S.Ct. 407, 418 n. 15, 9 L.Ed.2d 441 (1963); *see United States v. Stabler,* 490

F.2d 345, 350 (8th Cir.1974) (confession to murder corroborated by body and evidence of criminal conduct; evidence corroborating identity as killer unnecessary). In this case, the dead body and the manner of death support the conclusion that the Kelvin's death was the result of criminal conduct, thereby establishing the requisite trustworthiness of Treas–Wilson's confessions.

■ After reviewing the record, we conclude that ample evidence exists to support the jury's verdict. First, the evidence as a whole, including the six detailed confessions, supports the jury's conclusion that Treas–Wilson killed Kelvin Davis. Treas–Wilson's repeated and detailed confessions to friends, his mother, and law enforcement agents were compelling, and the jury was entitled to disbelieve Treas–Wilson's assertion at trial that he confessed only as a means of escaping life on the reservation. *See, e.g., Stabler,* 490 F.2d at 347 n. 1.

Second, the circumstances surrounding Kelvin Davis's death support the jury's determination that Treas–Wilson killed with premeditation. The jury was instructed that "killing is premeditated when it is the result of planning or deliberation." The government may prove premeditation by circumstantial evidence, *see United States v. Free,* 841 F.2d 321, 325 (9th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988), and need not "show that the defendant deliberated for any particular length of time." *United States v. Slader,* 791 F.2d 655, 657 (8th Cir.), *cert. denied,* 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986); *see generally* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 7.7(a), at 239–40 (1986). Viewed in the light most favorable to the government, the evidence indicates that Treas–Wilson broke into the house in search of beer, stumbled across the victim, inflicted at least one nonfatal injury inside the house, and then dragged the victim outside in order to kill him and dispose of the body. It is clear that a killer can develop premeditation during the incident at issue. *See, e.g., Thomerson v. Lockhart,* 835 F.2d 1257, 1259 (8th Cir.1987) (angry beating became calculated and deliberate murder). Here, both the dragging of the

---

1. In *Smith,* the Court noted that, in cases with no tangible corpus delicti, the proof necessary to establish corroboration might necessarily involve identity. 348 U.S. at 154, 75 S.Ct. at 198.

victim and the infliction of such a precise and fatal injury support the conclusion that, although Treas–Wilson might not have entered the Rocha house planning to kill, he exited with that intent. We conclude that sufficient evidence supports the jury's verdict finding Treas–Wilson guilty of first degree murder.

### III. Admission of the Photographs

■ Treas–Wilson also appeals the district court's decision to admit autopsy and crime scene photographs. The government offered autopsy photographs through Dr. Ross Zumwalt, a pathologist and the Chief Medical Investigator for the State of New Mexico. Those photographs depicted, among other things, the stab wound below the victim's right ear and the deep incision across his neck. The government offered the crime scene photographs through the testimony of Special Agent Frank Flores of the FBI. Those photographs also depicted the nature of the neck wounds. The defense contends that the photographs were overly prejudicial and served only to inflame the passions of the jury. We disagree.

We review the admission of photographs for an abuse of discretion. *See United States v. Sides*, 944 F.2d 1554, 1562 (10th Cir.), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 604, 116 L.Ed.2d 627 (1991). "[G]ruesomeness alone does not make photographs inadmissible." *United States v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir.1983). Rather, the district judge must balance the prejudicial effect of the photographs against their probative value, an exercise of discretion that is rarely disturbed. *Sides*, 944 F.2d at 1562; *see also United States v. Soundingsides*, 820 F.2d 1232, 1243 (10th Cir.1987). Here, the photographs, which indeed graphically depicted the nature of the fatal wound, were probative of Treas–Wilson's state of mind. Furthermore, the district court cautioned the jury about the photographs' graphic content and admonished them to view the photographs dispassionately. We cannot say that the district court abused its discretion.

**AFFIRMED.**