FILED
**United States Court of Appeals
Tenth Circuit**

**April 22, 2025**

**Christopher M. Wolpert
Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GEORGE MCENTIRE SMITH,

    Defendant - Appellant.

No. 23-7087

---

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:21-CR-00171-TDD-1)**

---

Rebecca Shepard (J. Wesley Bryant with her on the briefs), Federal Defender Program, Inc., Atlanta, Georgia, for Defendant-Appellant.

Lisa C. Williams, Special Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **BACHARACH**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

    George Smith appeals his convictions for first-degree murder and causing the death of another during the commission of an 18 U.S.C. § 924(c) offense, arguing that there was insufficient evidence for the jury to find that he (1) was

the shooter, (2) acted with malice aforethought, and (3) acted with premeditation. He also argues that the district court abused its discretion in addressing juror misconduct during deliberations and denying his motion for a mistrial, and that the prosecutor impermissibly misrepresented evidence and elicited false testimony. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm his convictions.

## BACKGROUND

### I.     Factual Background

#### A.     The Shooting and Investigation

On April 8, 2021, Smith spent the day with his great-uncle, Jimmy Arthur. Together, they visited a pawn shop where Smith sold a rifle and attempted to sell a .25 caliber Hawes pistol. Then they went to Taco Bell and brought the food back to Arthur's home. After lunch, Smith left to go to his house across the street where he lived with his grandfather, but later returned to Arthur's house to ask Arthur to take him to Walmart. While the men were at the store, Lena, Arthur's wife, ingested half a sleeping pill and some medication in preparation for a colonoscopy the next day and fell asleep on the couch in the back living room. When Arthur and Smith returned home that evening, they went to the dining table in the kitchen to play cards.

About 10:00 p.m., someone fatally shot Arthur in the back of his head and neck while he was seated at his dining table. Lena awakened to the gunfire, saw Smith standing at the end of the couch, and then went into the bathroom for

2

10–15 minutes. She did not see any blood on Smith or a gun. Smith told her to stay in the bathroom, but she didn't listen. When she exited the bathroom, she saw Smith holding a blue tarp and standing next to Arthur's dead body, which was lying on a sheet in the front living room. Smith had moved the body from the kitchen, but Lena told Smith not to disturb the evidence by covering the body. Lena asked Smith if he had called 911, and Smith told Lena he had. But Lena wanted to make sure the police had been notified, so at 10:04 p.m., Smith and Lena called the police together. During the call, Smith told Lena to tell the 911-operator that some men had broken into the house, shot Arthur twice, and then fled. That was the only call placed to 911.

When police arrived at the house at 10:10 p.m., Smith was waiting outside for them. Smith told the officers that he and his uncle had been playing cards at the dining table when one or two masked assailants entered through the front door and shot Arthur.[1] One officer remained with Smith while the others entered the house to investigate.

Stepping into the house, the officers saw Arthur's body lying several feet away on the floor in the front living room, atop the drop cloth. From the doorway, police could see most of the dining table and the kitchen straight ahead, separated from the front living room by an archway. The dining table fit six chairs—two each on the sides and one each on the ends. The left end of the

---

[1] Smith's account of the number of intruders varied among his statements.

3

table was pushed against a side wall, leaving the other end in the walkway. The two chairs on the far side of the table were pushed back away from the table, and the chair from the right end of the table was turned so that it aligned with the two chairs, forming a row of three. The stove and refrigerator were several feet behind the second and third chairs.

Police located blood on the front living room carpet, the kitchen floor, the kitchen ceiling, the refrigerator, and the seat cushions of the first and second dining chairs. Smith caused the blood to be in the living room by moving Arthur's body there. The backrest of the second dining chair was saturated with blood.

Police found a single spent .25 caliber shell casing on the third dining chair but never located a second shell casing. And though there were unfired rounds of .25 caliber ammunition in a different room, the unfired casings were made of a different material than the fired casing was. Police searched a shed on the property and the land surrounding the house, but they did not find any gun or ammunition associated with the shooting.

Outside the house, Smith spoke to several officers about what happened. In a recorded interview with FBI Agent Gil de Rubio, Smith recounted his day with Arthur, including their trip to the pawn shop to "pawn one of [Smith's] old guns." Supp. R. vol. II (Gov't Ex. 118), at 9:43. When asked about the gun, Smith said it was a 10 mm assault rifle. Agent Gil de Rubio asked whether Smith had other guns, and Smith said he didn't have any. Agent Gil de Rubio

4

followed up, pointing out that Smith had used the plural "guns." *Id.* at 10:29. Smith replied that he'd had other guns but didn't currently have any others. Smith did not mention the .25 caliber Hawes pistol and denied ever owning a pistol.

A different officer, Detective Blair, collected samples from Smith's hands and face to test for gunshot residue ("GSR"). Smith agreed to go with Detective Blair to the police station so that Detective Blair could collect samples from his clothes. At the station, Smith gave another statement to the police about the events of the evening. He maintained that a masked intruder entered the house and killed Arthur. Police did not arrest Smith.

After providing the samples and statements, Smith left the police station and returned to Lena's home to collect his belongings. By then, Lena's son-in-law was there, and he asked Smith if he had killed Arthur. Smith said he hadn't and that he would not do that to family. When Smith left, the son-in-law saw Smith walk somewhere behind the house.

Five or six days after the shooting, police returned to Lena's house and searched the back and side yards with a metal detector, but they did not find any evidence. Less than one week after that search, on April 20, officers searched Smith's home. They seized a pair of shoes, blue jeans, sweatpants, and a hat from Smith's bedroom. The jeans had some of Smith's blood on them, and the sweatpants—which Smith had worn on the night of the shooting—had a

mixture of blood from at least two people, consistent with Smith and Arthur. Police also found a small gun holster but did not find any firearms.

That same day, Agent Gil de Rubio and Detective Blair again interviewed Smith. Smith maintained that he had not shot Arthur and that an intruder had done so. The officers, having since learned that Smith had tried to pawn a .25 caliber Hawes pistol the day of the shooting, asked what had happened to the gun. Smith said that the gun wasn't his and that it had gone missing before Arthur was killed. At the end of the interview, the officers arrested Smith for murdering Arthur.

**B.    Forensic and Physical Evidence**

Dr. Shelton, the medical examiner, testified that Arthur died from two gunshot wounds to the back right side of the head and neck. The shots left no exit wounds. The head wound was surrounded by dot-like injuries consistent with powder stippling, which indicated that the muzzle of the gun had been one to four feet away from Arthur's head when it was fired. The neck wound lacked any stippling, suggesting the muzzle was more than four feet from the body when it was fired. Dr. Shelton testified there were many ways to achieve different ranges for the two shots, such as Arthur's body falling forward after the shot to the head or the shooter moving closer after the shot to the neck.

Police did not recover fingerprints from the spent .25 caliber shell casing in the kitchen. Other than the blood on Smith's sweatpants that was consistent with Arthur's blood, there was no forensic evidence relevant to whether Smith

6

was the shooter—none of Arthur's blood or DNA was on Smith's hands, face, or shirt; and neither Smith's hands, face, or his seized clothing tested positive for GSR. And police never found the murder weapon. Based on the .25 caliber shell casing found at the scene and bullet fragments recovered during the autopsy, the murder weapon could have been one of 76 different .25 caliber firearms, including a .25 caliber Hawes pistol.

### C.    Important Witness Testimony

#### 1.    Lena Arthur

In addition to testifying about the events on the night of the shooting,[2] Lena testified about Arthur's and Smith's relationship. Lena recalled that Arthur and Smith had a fight in 2020 when Smith went to live with her and Arthur. Both men were in the kitchen when Lena heard them fighting. Arthur told Smith not to put him in a headlock, and Smith told Arthur not to push him. Both men were cursing at each other. Arthur threw a chair and said that if he had a gun, he would shoot Smith. Lena entered the kitchen to break up the fight and stumbled (or was pushed) into a trash can. Smith went to see if she was all right and told Arthur, "If you ever hurt my aunt again, I'll kill you." R. vol. III, at 177.

---

[2] The day after the shooting, Lena fell and broke her pelvis, resulting in an 11-day stay in the hospital. She had no recollection of being interviewed by police officers after the shooting. And though police interviewed her again after her accident, Lena's trial testimony about the night of the shooting, in some ways, contradicted her earlier statements.

Despite this fight, Lena testified that Smith and Arthur had a positive relationship and were "crazy about" each other. *Id.* at 172. She understood that Smith and Arthur had made amends several months after the incident. And when the Arthurs moved in 2021, Smith helped them move. Lena testified that Smith and Arthur didn't have any disagreements the day of the shooting.

### 2.   Corey Chapel – Pawn Shop Employee

Chapel testified that Smith and Arthur came into the pawn shop together and that Smith tried to sell a computer, a rifle, and a .25 caliber Hawes pistol. Smith did not ask to buy a gun. Arthur and Smith appeared to be getting along, and Smith was polite and friendly. Later that day, Smith and Arthur returned to bring ammunition for the rifle Smith had sold. There was still no sign of conflict between the men, and they seemed friendly with each other.

Chapel stated that sometimes people sell items in the store parking lot and that he did not know what happened to the .25 caliber Hawes gun.

### 3.   FBI Agent Gil de Rubio

Agent Gil de Rubio testified about the recorded interviews she conducted on the night of the shooting and on April 20. The government admitted and played all three interviews at trial.

## II.   Procedural History

Smith was indicted on three counts relating to a shooting death in Indian Country. He went to trial on Count One, murder in Indian Country, 18 U.S.C. §§ 1111(a), 1151 & 1153; and Count Three, causing the death of another person

with a firearm, 18 U.S.C. § 924(j)(1). After a five-day trial, a jury convicted Smith on both counts. The district court sentenced Smith to a mandatory sentence of life in prison. The court entered final judgment, and Smith timely appealed.

## DISCUSSION

Smith challenges the sufficiency of the evidence, objects to the district court's handling of an incident of juror misconduct, and alleges that the prosecutor elicited false testimony and repeatedly misrepresented the evidence. He argues that each error independently warrants reversal. We address each issue in turn.

## I.    Sufficiency of the Evidence

First, Smith argues there was insufficient evidence to support his convictions because the prosecutor did not prove beyond a reasonable doubt that Smith (1) was the shooter, (2) acted with malice aforethought, and (3) acted with premeditation.[3] *See* R. vol. I, at 456–58 (Jury Instruction No. 14:

---

[3] The sufficiency of the evidence for Smith's § 924(j) conviction depends on the sufficiency of the evidence for Smith's murder conviction. To convict a defendant under 18 U.S.C. § 924(j), the prosecution must prove beyond a reasonable doubt that the defendant (1) caused the death of a person (2) in the course of violating 18 U.S.C. § 924(c). 18 U.S.C. § 924(j). Persons violate 18 U.S.C. § 924(c) if they use or carry a firearm "during and in relation to any crime of violence" or "in furtherance of any such crime." *Id.* § 924(c)(1)(A). Because both first and second degree murder are crimes of violence, *see United States v. Kepler*, 74 F.4th 1292, 1300 (10th Cir. 2023), and the alleged murder was with a firearm, Smith's § 924(j) conviction rises or falls with his murder conviction.

First Degree Murder in Indian Country - Elements) (requiring the government to prove beyond a reasonable doubt (1) that Smith caused the death of the victim, (2) that Smith killed with malice aforethought, (3) that Smith killed with premeditation, (4) that the killing took place in Indian Country, and (5) that Smith is an Indian).

We review de novo the sufficiency of the evidence to support a conviction. *United States v. Voss*, 82 F.3d 1521, 1524–25 (10th Cir. 1996). And we ask "whether[] taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* at 1525. But we do not "uphold a conviction obtained by piling inference upon inference." *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999) (internal quotation marks omitted). "The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." *Id.* (internal quotation marks omitted).

### A.    Identity of the Shooter

Smith argues there was insufficient evidence to support a finding beyond a reasonable doubt that he killed his uncle. He asserts the forensic evidence "ruled him out" as the shooter and that his conviction rests on "speculation, conjecture, and piling inference upon inference." Op. Br. at 32–33; *see also id.* at 34–35 (comparing his case to *United States v. Lovern*, 590 F.3d 1095 (10th

Cir. 2009) and *United States v. Woody*, 250 F. App'x 867 (10th Cir. 2007)). We disagree.

First, the forensic evidence did not rule out Smith as the shooter.[4] Unlike in *United States v. Woody*, where we reversed a second-degree murder conviction, Smith was certainly at the murder scene and was physically capable of carrying out the murder. In *Woody*, the only evidence of guilt was (1) witness testimony that the defendant had assaulted the victim, without a weapon, on the night of the murder and (2) the night before the murder, the defendant had stayed at a shack at which the murder weapon (a steak knife) was later recovered. 250 F. App'x at 875–77. No forensic evidence linked the defendant to the killing, and the defendant's severely injured hand "further erode[d] the already thin evidence [of guilt]." *Id.* at 877. Not so here. Though Smith tested negative for GSR, the sweatpants that Smith wore on the night of the shooting tested positive for what could have been Arthur's blood. And Smith had at least 10–15 minutes to tamper with the crime-scene evidence, including any evidence on his person, while Lena was in the bathroom. Having heard the government's criminologist expert testify that a negative GSR test "does not" eliminate a person from having fired a gun, in part because the

---

[4] But it cast doubt on Smith's story about the masked intruder or intruders. Based on the layout of the house, the positioning of the bloody chair in the kitchen, and the bullets to the *back* of Arthur's head, a jury would have been hard-pressed to find that an intruder shooting from the front door or front living-room area killed Arthur.

person could have washed the residue off their hands, R. vol. III, at 420, and knowing (1) that Smith had already disturbed the crime-scene evidence by moving Arthur's body and (2) that *someone* had tampered with the scene by removing the second spent shell casing, the jury could reasonably infer that Smith spent the 10–15 unsupervised minutes cleaning up and hiding evidence.

Second, though it's true the government's case relied solely on inferences drawn from circumstantial evidence, inferences may support guilt beyond a reasonable doubt so long as they "flow[] from logical and probabilistic reasoning." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). The constraint on inferences isn't the overall number of inferences the jury must make; it's how connected those inferences are to the evidence. *See United States v. Rufai*, 732 F.3d 1175, 1192 (10th Cir. 2013) ("[I]nferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion." (internal quotation marks omitted)). At trial, the evidence showed that Smith:

- had a previous altercation with Arthur several months before,

- was at the murder scene,

- had the means to carry out the murder,

- offered a story about masked intruder(s) shooting Arthur that was inconsistent with the layout of the house and the location of the bullet wounds,

- was unsupervised for at least 10–15 minutes after the shooting,

- did not call 911 in the 10–15 minutes after the shooting,

12

- tampered with the crime scene by moving Arthur's body during the 10–15 minutes following the shooting,

- lived across the street,

- lied to police about trying to pawn the .25 caliber Hawes pistol, and

- could not explain what happened to the .25 caliber Hawes pistol.

From this evidence, a jury could rationally conclude beyond a reasonable doubt that Smith was the shooter.

Smith argues *United States v. Lovern* supports reversal because the plethora of possible inferences that could be drawn from the evidence required "entertain[ing] a reasonable doubt." 590 F.3d at 1107 (internal quotation marks omitted). But the problem in *Lovern* was that the evidence yielded many different inferences. And we had "no way to distinguish among [the] several plausible and competing inferences[.]" *Id.* Because each inference was just as likely as the others, it was impossible for a jury to find guilt beyond a reasonable doubt. *Id.* But in Smith's case, many different facts yielded the same inference—that Smith was the shooter. That inference "flow[ed] from logical and probabilistic reasoning," *Jones*, 44 F.3d at 865, and so was proper.

Though no single piece of evidence definitively proved Smith was the shooter, the accumulation of evidence pointing to him as the shooter was sufficient to convict him.

**B.    Malice Aforethought**

Next, Smith argues that the government failed to establish malice aforethought beyond a reasonable doubt. The government responds that the jury could infer malice aforethought from the manner and means of the killing.

To kill with malice aforethought "means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." R. vol. I, at 457 (Jury Instruction No. 14: First Degree Murder in Indian Country - Elements); *United States v. Rosalez*, 711 F.3d 1194, 1204 (10th Cir. 2013). We agree with the government that a jury could reasonably infer that firing two bullets into the back of someone's head and neck was deliberate and intentional. Such a manner of killing is inconsistent with an accident or self-defense, and there was no evidence in the record from which the jury could have made such a finding anyway.

Smith argues that finding malice aforethought based on the manner of the killing requires piling "inference upon inference," which is not enough to satisfy the beyond-a-reasonable-doubt standard. Op. Br. at 37 (citing *Rufai*, 732 F.3d at 1188). But we count only one inference. The known fact of two shots to the back of the head and neck directly leads to the inference of deliberate and intentional conduct. That is not a piling of inferences. *See Rufai*, 732 F.3d at 1193 (finding impermissible speculation where the conclusion was five steps removed from the evidence). Sufficient evidence proved malice aforethought.

14

## C.    Premeditation

Finally, Smith argues the government presented no evidence of premeditation. The government responds that, like for malice aforethought, the manner and means of the shooting—two shots to the back of the head from several feet away—establish premeditation.

The court instructed the jury that a killing is premeditated "when it is the result of planning or deliberation. The amount of time needed for pre-meditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent." R. vol. I, at 457 (Jury Instruction No. 14: First Degree Murder in Indian Country - Elements). And in response to the jury's question about the definition of premeditation, the district court provided the following supplemental instruction:

> The act of meditating in advance; deliberation upon a contemplated act; plotting or contriving; a design formed to do something before it is done. Decision or plan to commit a crime, such as murder before committing it. A prior determination to do an act, but such determination need not exist for any particular period before it is carried into effect.

*Id.* at 489.

Here, a reasonable jury could find premeditation. To shoot Arthur in the back of the head, Smith would have had to stand up from where they were playing cards, circle around Arthur, retrieve and draw his weapon, aim at Arthur's head, and pull the trigger twice. A jury could reasonably infer that a

15

shooter taking these steps was "fully conscious of [his] intent [to kill]." *Id.* at 457. That is all that is required for the evidence to be sufficient. *See United States v. Treas-Wilson*, 3 F.3d 1406, 1409 (10th Cir. 1993) ("[T]he circumstances surrounding [the victim]'s death support the jury's determination that [the defendant] killed with premeditation.").

Given our finding that the manner of the shooting supports an intentional shooting for malice aforethought, we have difficulty conceiving how the jury would lack sufficient evidence of premeditation as a matter of law. Perhaps if the jury thought that Smith were already standing behind Arthur, had the loaded firearm on his person, and then impulsively shot Arthur in response to some slight or provocation (not rising to the level of heat of passion) made while Arthur was facing away from Smith, then it could find malice aforethought without premeditation. But even assuming those facts (which have no support in the record), we could not say as a matter of law that the jury could *not* find premeditation. Two shots to the back of the head, one from only several feet away, hardly forecloses premeditation. It is reasonable to infer a conscious awareness of intent to kill when the conduct requires making the decision to aim at the back of someone's head. Twice.

Having rejected Smith's theory that a masked intruder shot Arthur from the front door, the jury was left with no other explanation for Arthur's death, other than that Smith killed him. It had no evidence of accident or heat of passion or self-defense or anything other than premeditation. *See Jackson v.*

16

*Virginia*, 443 U.S. 307, 326 (1979) ("Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained."). Of course, that doesn't mean that in the absence of any evidence about what happened, the jury could find premeditation. But the circumstantial evidence here—the number of shots, the proximity to his victim, shooting from behind, and aiming at a body part that was certain to cause death—supports an inference of premeditation.

We held as much in *United States v. Treas-Wilson*. There, the defendant inflicted a nonfatal wound inside the house, then dragged the victim outside where he killed him with a "precise" four-inch incision to the neck. 3 F.3d at 1407, 1409. We said it was "clear that a killer can develop premeditation" during the time it takes to inflict a nonfatal wound and drag the victim out of the house. *Id.* at 1409. And "the infliction of such a precise and fatal injury support[s] the conclusion that [the defendant killed with premeditation]." *Id.* at 1409–10; *cf. Jackson*, 443 U.S. at 325 (finding sufficient evidence for premeditation when the defendant's intoxication defense was discredited and the defendant "shot the victim not once but twice . . . at close, and thus predictably fatal, range").

Smith argues the fact that he tried to sell the Hawes pistol earlier that day cuts against premeditation because it shows he didn't have a plan to shoot Arthur. But "premeditation may exist in the twinkling of an eye." *Hickory v.*

17

*United States*, 151 U.S. 303, 314 (1894). The jury could find premeditation in the time it took to aim the gun at Arthur's head. Sufficient evidence supported the premeditation finding.

Because sufficient evidence supported the government's case that Smith (1) shot and killed Arthur with (2) malice aforethought and (3) premeditation, the jury properly found Smith guilty of first-degree murder. And because his first-degree murder conviction involved a firearm, sufficient evidence also supported the jury finding that Smith was guilty of the § 924(j) charge.

## II.    Juror Misconduct

Next, Smith argues the district court abused its discretion in addressing an incident of juror misconduct and in denying his related motion for a mistrial.

"[A] district court has considerable discretion in deciding whether jurors are able to perform their duties without prejudice or bias." *United States v. Ashby*, 864 F.2d 690, 694 (10th Cir. 1988). "We review the denial of a motion for a new trial based upon juror misconduct for an abuse of discretion." *United States v. Davis*, 60 F.3d 1479, 1482 (10th Cir. 1995) (internal quotation marks omitted). "A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions." *Id.* at 1484–85 (quoting *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992)). When a jury or juror is exposed to external information, the government has the burden to prove the misconduct

18

harmless beyond a reasonable doubt. *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003).

### A.    The Misconduct

Before opening statements, the district court instructed the jury not to discuss the case with each other or with anyone else and not to conduct any independent investigation. The court repeated this instruction before recessing for breaks and at the end of each day.

After jury instructions and closing arguments, the jury deliberated for the rest of the day and then recessed for the evening. Before recessing, the jury asked for clarification of the definitions of "deliberate intent" and "premeditation." R. vol. III, at 665–66. The court did not provide an answer before recessing.

The next morning, the court consulted counsel about a response to the jury's question. About 9:50 a.m., the jury resumed deliberations. At 11:18 a.m., the court informed counsel that it had learned about an incident of juror misconduct. On receiving the information, the court immediately instructed the jury to stop deliberations and to wait for further instructions from the court. The court stated to counsel:

> This is what I know: That one of our jurors, [P.B.], he called an attorney apparently on his way to the courthouse this morning – or sometime before he came to the courthouse – who is a friend of a friend of his. So this isn't an attorney that he really knows directly.
>
> And he asked a question of the attorney . . . about something that she really didn't feel like, you know, they were communicating

19

clearly about. She really didn't understand what he was talking about.

But he asked some question about when a judge sends a jury and directs them to have further deliberations. She responded that she thought what he was talking about was an *Allen* charge. And then he said to her that he didn't think that fit the circumstances he was talking about.

Then he said that he needed some help with terminology because he had to convince them – and then at that point she stopped him and she said, "Are you on a jury?"

And he said that he was.

And she said, "I can't talk to you," and she hung the phone up.

He then sent her a text message, and she has forwarded the text message on to our court clerk, who has forwarded it on to me. Oh, by the way, as soon as she hung up on him, she called the Bar Association, and the Bar Association told her, [y]ou need to notify the Court. So [she] is trying to do everything she can the right way.

So this is the text message that [P.B.] sent to [the attorney] because she abruptly, you know, told him, "I can't talk to you." . . .

He says: "I reported my transgression to the Judge. While certainly not pleased with my actions, he said he valued my transparency and appreciated my desire to better articulate my understandings. His decision was that no integrity had been compromised and the phrase I was looking for was a distinction without a difference. No names were mentioned. I apologize for not considering how my actions potentially affected you. Won't happen again."

R. vol. III, at 671–74. The court told counsel that it planned to bring P.B., the foreperson, and "maybe [a] sample" of other jurors in for questioning. *Id.* at 674. The court also stated that no matter what P.B. said, he would be removed from the jury. Neither party objected to the court's plan, but Smith requested that the court voir dire the entire jury panel to ensure P.B. had not tainted any jurors.

20

Then the court placed P.B. under oath and asked him about his conduct. P.B. admitted that he asked the attorney about the same topics as raised by the jury questions provided to the court the previous afternoon: the difference between premeditation, malice aforethought, intent, and deliberate actions. He also asked about what happens if a jury cannot unanimously agree. P.B. stated that he did not speak with any other jurors about his conversation with the attorney. And he admitted that he had lied to the attorney when he texted her that he had told the judge about their conversation. Smith also questioned P.B., asking if P.B. knew of any other jurors who had consulted outside sources, and P.B. answered negatively. And P.B. reiterated that he had not spoken about the matter with a smaller group of jurors he had been with before deliberations began that morning.

Then the judge questioned the jury foreperson. The following exchange occurred:

> THE COURT: Okay. Did [P.B.], in your deliberations this morning, indicate to you all that he had received some other information through his own research about these legal principles?
>
> [K.C.]: Not that I can think of offhand.
>
> THE COURT: Okay. To your knowledge, has any member of the jury done any outside research, made any attempt to find out information about this case other than that – what was presented to them in court?
>
> [K.C.]: No one has talked about any kind of outside involved in this case, no, sir.
>
> THE COURT: Okay.

21

[K.C.]: The only thing that [P.B.] talked about this morning at the very beginning was he had heard some of the other jurors' frustrations with our process, without trying to go into that detail –

THE COURT: Uh-huh.

[K.C.]: – and he offered a way to resolve it.

THE COURT: Okay.

[K.C.]: And we kind of pushed through that. But he didn't talk about any kind of phone call or outside conversation like that.

THE COURT: So his – his discussion this morning for his part really had to do with trying to find a way that you all could move forward with your deliberations?

[K.C.]: He felt singled out –

THE COURT: Yeah.

[K.C.]: – with stuff and –

THE COURT: He was offering up a process –

[K.C.]: Yes.

THE COURT: – to go forward.

[K.C.]: He was trying to figure out a way we could all work together, I guess, would be the best way to answer that.

THE COURT: Okay. All right.

*Id.* at 695–98. Then Smith questioned K.C. about P.B.'s participation in deliberations that morning. K.C. stated that P.B. was active in deliberations but that "he was very – he was very neutral and would not – did not give direction one way or the other on how he was feeling." *Id.* at 698–99.

The court excused K.C. and told counsel it planned to call in another juror, A.B.J. The court also stated:

22

It seems to me like, from my questioning of [P.B.], from the questioning of [K.C.], that this thing is contained. [P.B.] was – was very nervous and he was very remorseful, I mean, literally hanging his head at times. And I believe that he was forthcoming with me and my questions.

And I certainly believe [K.C.]. He was unequivocal, forthcoming, and I'm satisfied that, at least from his perspective, [P.B.] did not inject any outside information into the jury's deliberations in the time they were deliberating this morning.

*Id.* at 701. When A.B.J. arrived, the court asked the following questions:

THE COURT: – did [P.B.] have any conversations with you, for instance, about information he might have learned on his own that wasn't learned in court?

[A.B.J.]: No, not with – I'm trying to remember like – I don't know if you've spoke with him or know him. He's knowledgeable, you know, you can tell he's learned –

THE COURT: I've already spoken with him.

[A.B.J.]: Okay. . . . Yeah. I'm trying to think – he said something this morning just about – and it wasn't anything like, I didn't feel, like about this case. You can tell he knows a lot about a jury, a trial, kind of the legal language, but I don't feel like – I can't say there is anything that he said – and he never said anything to me, but like to the group that I would be like, oh, he's done some research or learned something. He's hung up on words and definitions big time.

THE COURT: Okay. So, from your perspective, he hasn't injected any information into the deliberations that he got from a source outside of the evidence in the case?

[A.B.J.]: Right. No. And I'm shocked because – like, so I'm a pharmacist and we have talked about medications that have – that came up. He's like, We've got an expert here. She can't speak as an expert, I don't want this to be a mistrial. So I'm really surprised – like, he's very careful. He likes to control the room and –

THE COURT: Yeah.

[A.B.J.]: – what's going on.

23

*Id.* at 703–04. Then Smith questioned A.B.J. about P.B.'s participation in the deliberations that morning. A.B.J. stated that P.B. was actively participating but that "he won't speak his opinion. He wants everyone else to try to justify their reason for what – the conclusions that they've brought. It's kind of like he wants everyone else to convince him why he's wrong and they're right." *Id.* at 705. A.B.J. also stated that she was satisfied that P.B. did not inject any outside information into their deliberations.

After excusing A.B.J., the court said that it felt it unnecessary to question any other jurors. Smith acknowledged that both K.C. and A.B.J. were "highly credible and we don't question anything that they say" but that he still wanted the court to question each juror independently. *Id.* at 707. The court said that it would poll the jury as a group but that nothing merited individually questioning the other jurors, and it would just be "a waste of time in my view." *Id.* Smith moved for a mistrial, and the court denied it, stating, in part:

> [T]he Court does not believe that there is manifest necessity for the termination of the proceedings nor will the ends of public justice be defeated by continuing on with the jury with the addition of . . . the first alternate.
>
> The other jurors, [K.C.], the foreperson, and [A.B.J.], could not have been more credible, forthcoming, candid with the Court, and they both were unequivocal in their statements that [P.B.] had not injected any outside information into the deliberations this morning.
>
> They spoke of [P.B.] as someone who was soliciting the views of other jurors. [K.C.] said that this morning [P.B.] was looking for a process for the jury to move forward working together. It sounded more like a process type of position he was taking as opposed to a substantive position.

24

*Id.* at 709, 711–13.

On the jury's return to the courtroom, the district court asked the jury, collectively, if it had followed the instruction to not do outside research, and the jurors replied affirmatively. The court also asked if P.B. had injected any outside information into the deliberations, and the jurors replied negatively. The court did not allow counsel to ask additional questions. Smith renewed his motion for a mistrial, and the court again denied it, noting that the jury deliberations that morning were, at most, an hour-and-a-half long. Then the court seated the first alternate juror and instructed the jury to begin its deliberations anew. The jury reached a verdict in slightly less than two hours.

## B.    Analysis

Smith argues that the district court abused its discretion by not permitting him to explore whether other jurors had been tainted. He argues that he needed to question each individual juror because the "two questioned jurors were not privy to every interaction [with P.B.] and could not provide information about conversations . . . that they were not part of." Op. Br. at 42. And he alleges the district court's refusal to permit this questioning amounted to a denial of a hearing. He also asserts that the district court failed to apply the presumption of prejudice and did not hold the government to its burden of disproving prejudice. We disagree.

First, the district court *did* conduct a hearing—it individually questioned P.B., K.C., and A.B.J. and allowed Smith to do the same. The court also

25

considered the evidence from the attorney P.B. had spoken to. And the court asked the collective jury whether any juror had obtained outside information about the case and whether P.B. injected any outside information into deliberations. That the court refused to question additional jurors does not eliminate the fact of the hearing.

Second, the district court did not abuse its discretion in declining to question additional jurors about their conversations with P.B. *See Ashby*, 864 F.2d at 694 (finding no abuse of discretion where district court declined to question all the jurors about their conversations with the tainted juror and instead polled the jurors about whether they believed their ability to be fair and impartial had been compromised). Based on the hearing, the district court determined that none of the information from P.B.'s conversation with the attorney had tainted the other jurors. Though P.B. actively participated in the deliberations that morning, including by proposing a process to aid in deliberations, he did not express his views about the case or communicate anything about his conversation with the attorney. The court confirmed the substance of the three jurors' statements when it asked the jury, collectively, whether any juror had obtained outside information about the case and whether P.B. injected any outside information into deliberations. "There was no evidence to suggest that any juror other than [the one tainted juror] heard any prejudicial statement. The question of whether to voir dire the jury was a matter for the trial court's discretion and will not be disturbed in the absence of clear

abuse." *United States v. Rosales*, 680 F.2d 1304, 1306 (10th Cir. 1981); *see also United States v. Hines*, 696 F.2d 722, 730–31 (10th Cir. 1982) (finding no abuse of discretion when the court held a hearing to determine the nature of a two-minute conversation between an FBI witness and two jurors and concluded that the conversation did not involve the merits of the case or evidence and did not taint the jury); *United States v. Day*, 830 F.2d 1099, 1104 (10th Cir. 1987) (finding no abuse of discretion where "the trial court, armed only with the undisputed content of the conversation, elicited at the hearing, had an adequate basis to find, as a matter of law, that no prejudice resulted").

"The communication [with the attorney] was improper, and it is unfortunate that it occurred. However, [the defendant was] not prejudiced by it, and the court acted properly in denying [his] motion for a mistrial when, after a proper hearing, the harmlessness of the communication was made to appear." *Hines*, 696 F.2d at 731. We affirm.

## III.    Prosecutorial Misconduct

Finally, Smith argues two instances of prosecutorial misconduct warrant a new trial: (1) repeatedly misrepresenting evidence and (2) knowingly eliciting false testimony.

Whether prosecutorial misconduct occurred is a mixed question of law and fact that we review de novo. *United States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996). We consider (1) whether the prosecutor engaged in misconduct and (2) the effect of the misconduct on the verdict. *See United States v. Currie*, 911

F.3d 1047, 1055 (10th Cir. 2018). Because Smith did not object at trial, we review the alleged misconduct for plain error. *United States v. Hall*, 473 F.3d 1295, 1305 (10th Cir. 2007). Under plain-error review, we reverse only if the prosecutor's conduct is plainly improper, affected the defendant's substantial rights, and undermined the fairness and integrity of the judicial proceedings. *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011).

### A.    Misrepresenting Evidence

Smith argues that the government repeatedly misrepresented evidence by stating that Arthur had been shot "execution style" and at "close" range. Op. Br. at 43–44. We disagree.

First, stating that Arthur was shot "execution style" did not contradict any trial testimony. Smith offers no authority that supports his contention that "execution style" cannot refer to a shooting to the back of a person's head and neck. Indeed, caselaw shows that "execution style" has been used to refer to a shooting to the back of the head, among other shootings. *See Woodford v. Visciotti*, 537 U.S. 19, 20, 26 (2002) (describing a forward-facing shooting, two to four feet from the victim, as "execution-style"); *United States v. Magnan*, 863 F.3d 1284, 1287–88 (10th Cir. 2017) (same for a rapid shooting of multiple victims); *USAA Cas. Ins. v. Hancock*, No. 1:12-CV-01062-RB-LFG, 2013 WL 12328888, at *1 (D.N.M. Sept. 25, 2013) (describing a shooting to the back of the head as "execution style"); *Valenzuela v. Medina*, No. 1:10-CV-02681-WJM, 2011 WL 4369206, at *7 (D. Colo. Sept. 19, 2011) (same for a shooting

28

between six inches and three feet from the victim). It is not plain that the prosecutor's statement was improper.

Second, though Dr. Shelton testified that the shooting was at an "intermediate range," R. vol. III, at 362, 368–70, 382–83, the government's statements about "close" range, in context, do not misrepresent the evidence. In closing argument, the government made these statements about "close" range:

- "He couldn't even face his killer. He didn't -- did he even know what was happening when it came about? Because two shots, two times. No other injuries. *And this was close -- closer than 4 feet -- or no greater than 4 feet away.*" *Id.* at 610 (emphasis added).

- "Blood is found in the kitchen, not the [front] living room area. . . . So we can assume from that -- we can draw conclusions from that that the victim was killed in the dining room. . . . *He had -- he was shot twice with the one shot having stippling around the wound, showing that it had to have been in close range.* So was the shooter at the door in the living room or was he in the kitchen/dining room area?" *Id.* at 611–12 (emphasis added).

The first statement correctly repeats Dr. Shelton's testimony that the muzzle was no more than four feet away. The government appears to be using "close" in the colloquial sense, and even if it were trying to use the technical term, its statement about the actual distance was proper. The second statement uses "close range" to undercut Smith's theory that masked men shot Arthur from the front living room. The government argued that the shooter had to be in the kitchen/dining room area, not the living room, because the stippling showed the muzzle was (relatively) close to Arthur. A shooter in the living room would

greatly exceed the one-to-four-foot range that Dr. Shelton testified about. These statements did not misrepresent the evidence.

### B.    Eliciting False Testimony

Next, Smith argues the government knowingly elicited perjured testimony from Detective Blair about the timing of the GSR test to explain why the test came back negative. Op. Br. at 45–46; *see* R. vol. III, at 409, 417 (expert criminologist testifying that the concentration of GSR decreases on living subjects after eight hours). Detective Blair testified on direct examination, based on the GSR kit with his signature and time stamp on it, that he performed the GSR test at 5:50 a.m., almost eight hours after the shooting. But he performed the test at 3:20 a.m., only five hours after the shooting. Smith alleges the government knew this testimony was false because the government had produced the document listing 3:20 a.m. as the test time during discovery, and because the correct time was discussed at the pretrial suppression hearing.

First, we consider whether Detective Blair's testimony was perjury. Perjury occurs when a witness "willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true." 18 U.S.C. § 1621(1). But "[c]ontradictions and changes in a witness's testimony alone do not constitute perjury[.]" *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991). Though Detective Blair initially testified that he performed the GSR test at 5:50 a.m., when presented with the document listing 3:20 a.m. as the collection time, Detective Blair agreed that his earlier testimony was incorrect, and that 5:50

30

a.m. was the time he *sealed* the test kit, not administered it. So his testimony that he performed the test at 5:50 a.m. seems to be no more than a mistake.

Second, even if it were true that Detective Blair perjured himself, it is not clear that the government intentionally elicited that incorrect testimony. True, the government had Detective Blair's report that listed 3:20 a.m. as the collection time and 5:50 a.m. as the sealed time. But the GSR test kit the government referenced in direct examination listed only 5:50 a.m. Given both documents, it is not plain that the government knowingly and intentionally tried to elicit the 5:50 a.m. testimony to conceal the 3:20 a.m. testimony. Smith has pointed to no facts and has provided no caselaw that suggest otherwise.

Finally, even if Smith established a plain error, the error would not have affected his substantial rights. As discussed above, Smith corrected Detective Blair's testimony on cross examination. And the court admitted into evidence the document showing that Detective Blair performed the GSR test at 3:20 a.m. R. vol. III, at 272. So Smith suffered no prejudice.

Because it is not plain that Detective Blair intentionally lied about when he performed the GSR test or that the government intentionally solicited incorrect testimony, there was no misconduct.

## C.     Cumulative Error

Finally, Smith argues that the prosecutorial misconduct, taken cumulatively, warrants reversal. But because we find no misconduct, we have no errors to cumulate.

**CONCLUSION**

Though circumstantial, the evidence at trial was sufficient to convict Smith of first-degree murder and causing the death of another beyond a reasonable doubt. The district court did not abuse its discretion when handling the juror misconduct, and there was no prosecutorial misconduct. We affirm Smith's convictions.

*United States v. George McEntire Smith*, No. 23-7087
**BACHARACH**, J., concurring in part and dissenting in part as to
*Discussion, Part I(C)* of the majority opinion.

The majority concludes in part that the government presented sufficient evidence of premeditation to support a conviction for first-degree murder. I respectfully disagree.

On the element of premeditation, the government needed to show that Mr. Smith had decided in advance to kill Mr. Arthur. *United States v. Nichols*, 169 F.3d 1255, 1276 (10th Cir. 1999) (stating that the premeditation element of 18 U.S.C. § 1111(a) requires a "prior design to commit murder"). To determine whether the government showed premeditation, we consider the evidence and all reasonable inferences in the light most favorable to the government. *United States v. Reddeck*, 22 F.3d 1504, 1507 (10th Cir. 1994). But we don't credit inferences resting on speculation or conjecture. *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995).

The only evidence that could conceivably bear on premeditation was that

- Mr. Arthur had been shot in the back of the head and neck while he was seated,

- the killer had stood behind Mr. Arthur when pulling the trigger, and

- Mr. Arthur and Mr. Smith had been seated at some point before the shooting.

From this evidence, the government argues that a factfinder could infer that Mr. Smith had decided to kill while he was sitting, had arisen from his chair, had circled around Mr. Arthur, and had shot him from behind. And in the government's view, Mr. Smith must have used "some degree of stealth in planning [the] shooting" because Mr. Arthur hadn't turned around. Appellee's Resp. Br. at 37.

But the evidence could create an equally plausible inference that Mr. Smith had

- arisen from the table for any number of other reasons,

- stood behind Mr. Arthur when provoked to shoot, and

- impulsively fired the gun without any prior plan.

In that version of events, the killing wouldn't have been premeditated. *See United States v. Nichols*, 169 F.3d 1255, 1276 (10th Cir. 1999) (stating that premeditation requires "a design formed to do something before it is done" (quoting *United States v. McVeigh*, 153 F.3d 1166, 1198 (10th Cir. 1998))).

The evidence is equally susceptible to either interpretation, so the government's version is based on speculation rather than a reasonable inference. *See United States v. Goldesberry*, 128 F.4th 1183, 1192 (10th Cir. 2025) ("An inference is unreasonable if it requires the jury 'to engage in a degree of speculation and conjecture that renders its findings a guess or mere possibility.'" (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995))). And we can't base guilt on speculation about what

2

might have happened without any evidence about what did happen. *See United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995) ("We cannot permit speculation to substitute for proof beyond a reasonable doubt.").

The majority acknowledges that the jury might have rejected premeditation if Mr. Smith had stood behind Mr. Arthur and impulsively shot him. Maj. Op. at 16. But the majority suggests that even in this scenario, a reasonable jury *could have* inferred premeditation because Mr. Smith had aimed and fired at Mr. Arthur's head from close range. *Id.* at 16. But how could the jury draw that inference? A shooting at close range could suggest an intention to kill, but couldn't possibly suggest a prior design to kill. *See Sperry v. McKune*, 445 F.3d 1268, 1272 (10th Cir. 2006) (stating that premeditation requires "a quantum of reflection . . . absent from the deliberative process necessary to act intentionally").

The majority likens the government's evidence to the evidence of premeditation in *United States v. Treas-Wilson*, 3 F.3d 1406 (10th Cir. 1993). But in my view, *Treas-Wilson* is distinguishable. There the defendant inflicted a nonfatal injury before dragging the victim outside and killing him by cutting his neck. *Id.* at 1407, 1409–10. We concluded that the evidence of premeditation was sufficient based on

- the dragging of the victim after the initial injury and

- the "precise" nature of the fatal injury.

*Id.* at 1409–10.

3

Here too, the fatal injuries were *precise*. But the evidence reflects little about the events preceding the shooting. The evidence shows only that

- Mr. Arthur and Mr. Smith had sat at some point in the evening and

- Mr. Smith had stood up at some point.

In my view, those facts don't support a finding beyond a reasonable doubt of a "prior design to commit murder." *United States v. Nichols*, 169 F.3d 1255, 1276 (10th Cir. 1999). So I respectfully dissent from the majority's holding on premeditation. I would instead remand with instructions to

- enter a conviction for second-degree murder and

- resentence Mr. Smith.

28 U.S.C. § 2106; *see also* 18 U.S.C. § 1111(a) (establishing elements of first- and second-degree murder); *United States v. Smith*, 13 F.3d 380, 383 (10th Cir. 1993) (granting similar relief).[1]

---

[1]    I join the rest of the majority opinion.